CAROLINA POWER & LIGHT COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant,

No. 97–268C.

United States Court of Federal Claims.

Oct. 17, 2000.

Robert A. Mangrum, Washington, DC, for plaintiff.

Theodore R. Carter, III, U.S. Department of Justice, Washington, DC, with whom were David W. Ogden, Assistant Attorney General, Director J. Christopher Kohn, and Deputy Director Sandra P. Spooner, for defendant.

## OPINION

FIRESTONE, Judge.

In this action, plaintiff, Carolina Power & Light Company ("CP & L") challenges the legality of an assessment imposed on certain domestic utilities under the Energy Policy Act of 1992 ("EPACT"), 42 U.S.C. § 2297g–1 (1994), to help pay for the decontamination and decommissioning of the government's uranium enrichment facilities. EPACT requires domestic utilities that purchased uranium enrichment services from the government in the past to contribute up to $2.5 billion over a fifteen-year period for cleanup of the facilities. The remaining funds necessary for the cleanup are to be provided from the general revenue. CP & L contends that the assessment imposed on past purchasers of government uranium enrichment services is unlawful as: (1) a deprivation of property without due process in violation of the Fifth Amendment; (2) a taking for public use without compensation in violation of the Fifth Amendment; and (3) a breach of various contracts between CP & L and the government for the purchase of uranium enrichment services. The United States contends that it is entitled to judgment as a matter of law with respect to all of these claims. For the reasons that follow, the court **GRANTS** the United States' motion for summary judgment.

## I. BACKGROUND

This case is one of multiple cases brought by domestic utilities that purchased uranium enrichment services from the United States between approximately 1969 and 1993. CP & L and the other utilities originally challenged their obligation to pay into EPACT's Uranium Enrichment Decontamination and Decommissioning Fund under a breach of contract theory. In their initial actions, the utilities claimed that the EPACT assessment was an impermissible attempt to reprice expired fixed-price contracts between the utilities and the United States, and therefore amounted to a breach of those contracts. The breach of contract theory was litigated and rejected by the Court of Appeals for the Federal Circuit in *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed.Cir. 1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). In that decision, the Federal Circuit upheld the EPACT assessment as "a general exercise of Congress's taxing power for the purpose of addressing a societal problem." *Id.* at 1577. The Circuit concluded that the assessment imposed on past domestic utility purchasers to help pay for the cleanup of government-owned enrichment facilities was "not a deliberate retroactive increase in the price of those contracts," but was instead, "the Government's way of spreading the costs of the later discovered decontamination and decommissioning problem on all utilities that benefit[t]ed from the Government's service, whether or not those services were acquired by contract from the Government." *Id.* at 1580.

Following the Federal Circuit's decision in *Yankee Atomic*, on February 8, 1999, CP & L amended its complaint to add the constitutional challenges to EPACT identified above, as well as a new breach of contract claim based on later-signed agreements between CP & L and the government, which were not specifically addressed by the Federal Circuit. The government filed a motion to dismiss CP & L's amended complaint on February 9, 1999, for failure to state a claim.

In order to assist the court in evaluating the motion, the court asked the parties to submit supplemental briefs on specific issues

identified by the court. The court also asked the parties to explore whether they could stipulate to the material facts at issue, since it appeared that many of the facts alleged by the parties were not disputed. After the supplemental briefs were filed and while the motion to dismiss was still pending, other members of this Court entered decisions in *Maine Yankee Atomic Power Co. v. United States*, 44 Fed.Cl. 372 (1999), *appeal docketed*, No. 99–5156 (Fed.Cir. Sept. 23, 1999), *Omaha Public Power District v. United States*, 44 Fed.Cl. 383 (1999), *appeal docketed*, No. 99–5160 (Fed.Cir. Sept. 29, 1999), *Sacramento Municipal Utility District v. United States*, 44 Fed.Cl. 395 (1999), *appeal docketed*, No. 99–5158 (Fed.Cir. Sept. 28, 1999), and *Commonwealth Edison Co. v. United States*, 46 Fed.Cl. 29 (2000), *appeal docketed*, No. 00–5069 (Fed.Cir. Apr. 26, 2000), dismissing similar challenges to the constitutionality of EPACT's assessment scheme, as had been raised by CP & L in its amended complaint. Thereafter, the government submitted its reply supplemental brief labeled as a motion for summary judgment, along with a statement of stipulated facts that had been agreed to by the parties.

In the meantime, the plaintiffs in *Maine Yankee* appealed to the Federal Circuit, and CP & L requested a stay of proceedings pending the outcome of the Federal Circuit's review. In addition, CP & L submitted a statement of outstanding factual issues that CP & L claimed would require additional discovery and preclude resolution of the case on summary judgment. The government disagreed and argued, in reply to the stay request, that a stay of the case would not be appropriate, and that the court should instead proceed with summary judgment.

After a hearing, the court denied the stay over CP & L's objections, and ordered final briefing on the government's summary judgment motion. Following briefing, the court heard oral argument on September 12, 2000.

## II. FACTS

The following material facts are not in dispute. CP & L is a domestic utility organized under the laws of the state of North Carolina and is engaged in the sale and distribution of power generated from nuclear fuels. To this end, CP & L owns and operates nuclear generating plants, which are located in the states of North Carolina and South Carolina.

The principal fuel for nuclear reactors, such as those operated by CP & L, is enriched uranium. Between 1970 and 1993, CP & L purchased uranium enrichment services from the United States, through the Department of Energy ("DOE") and its predecessor agencies.[1] CP & L purchased enriched uranium from the government under a number of different standard-form fixed-price contracts, which were embodied in Contract Nos. AT–(40–1)–4134–DUE, AT–(40–1)–4195–DUE, AT–(40–1)–4342–DUE (later designated DE–SC05–72UE04342), and DE–SC05–84UE07505, all of which were closed out prior to the filing of this lawsuit. By statute, the prices charged by the government for its enrichment services under these fixed-price contracts were to be calculated "on a basis of recovery of the Government's costs over a reasonable period of time ...." 42 U.S.C. § 2201v (1970).

By late 1984, Contract Nos. AT–(40–1)–4134–DUE and AT–(40–1)–4195–DUE had expired by their own terms. In January 1984, CP & L and the government entered into a Supplemental Agreement of Settlement ("Settlement Agreement") regarding Contract No. DE–SC05–72UE04342, the last of CP & L's original contracts remaining in effect at the time. Under the Settlement Agreement, CP & L and the government agreed to terminate Contract No. DE–SC05–72UE04342, and to exchange mutual releases by which the government expressly agreed to "unconditionally [waive] any claim against [CP & L] by reason of the termination of the contract and releases it from any and all

---

**1.** The DOE took over as the administrative agency responsible for managing the United States' uranium enrichment facilities and overseeing the sales of its services to third parties in 1977.

Prior to 1977, the Atomic Energy Commission, followed by the Energy Research and Development Administration, was responsible for the government's uranium enrichment program.

obligations arising under the contract by reason of its termination."

Also in 1984, DOE introduced its "Utility Services Contract," which included lower prices and more flexible terms than its prior contracts. The Utility Services Contract provided explicitly that, in response to the changing needs of its customers, "DOE intends to serve as a reliable long term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation ...." Contract No. DE–SC05–84UE07505 at 1. CP & L and the government subsequently entered into a Utility Services Contract (Contract No. DE–SC05–84UE07505). CP & L terminated this Utility Services Contract when it entered into a contract with the United States Enrichment Corporation ("USEC") on January 10, 1995.[2]

In 1992, Congress enacted EPACT, which amended the Atomic Energy Act of 1954 to provide for the establishment of a "Decontamination and Decommissioning Fund" ("D & D fund"). 42 U.S.C. § 2297g. Under the challenged provision of EPACT, the cost of the D & D fund is shared between the government and domestic utilities that purchased enriched uranium prior to October 24, 1992, either directly from the government or through third parties. Id. § 2297g–1(b), (c), (d). Pursuant to this legislative scheme, the government contributes 68% of the cost and the utilities contribute 32% of the cost of the D & D fund.[3]

Under DOE regulations implementing EPACT, the government issues a bill, called a special assessment, to CP & L and similarly situated utilities on an annual basis. By statute, the overall contribution made by all utilities through the special assessment is capped at $150 million per year and terminates after the earlier of fifteen years or the collection of $2.5 billion. Id. § 2297g–1(c),(e). The statute further provides that the assessment "shall be deemed a necessary and rea-

sonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost." Id. § 2297g–1(g).

Each September since 1992, CP & L has received a bill from DOE for payment of the EPACT assessments. From September 1992 until February 1999, the date of its amended complaint, CP & L paid a total of $38.8 million in EPACT assessments. CP & L pays the assessments from its corporate funds and the amount of the assessment is then recovered in the rates CP & L charges its customers as a fuel cost. CP & L admits that it has to date been able to recover the entire expense of the EPACT assessment in the rates it charges its ratepayers.

In addition to the stipulated facts set forth above, CP & L submitted a statement of "Outstanding Factual Issues," which it contends precludes summary judgment in favor of the United States and warrants further discovery. The government argues that even if the court were to assume all the alleged facts to be true, they would not alter the outcome of the case, and therefore they are not material. The critical facts relied upon by CP & L in its opposition to summary judgment are summarized below.

CP & L's principal factual contention is that it was not responsible, in any way, for the contamination that occurred at the government-owned uranium enrichment facilities. In this connection, CP & L asserts that at all times, the government was the sole and exclusive owner and operator of these facilities. Until approximately 1969, CP & L contends, approximately 96% of the enriched uranium produced by the government was used solely for national defense purposes. It was during this time, CP & L asserts, that the buildings, equipment, and property at and surrounding these facilities became contaminated with uranium, its byproducts, and other hazardous materials. According to CP

2. Compl. ¶ 37. Under EPACT, Congress transferred DOE's uranium enrichment program to USEC, a newly created entity owned by the United States, and authorized USEC to develop a plan for the ultimate sale of the uranium enrichment program to private investors 42 U.S.C. §§ 2297b, 2297d.

3. Foreign utilities that purchased enriched uranium from the government were exempted from and have no obligation to contribute to the D & D fund.

& L, little, if any, additional contamination of the government's uranium enrichment facilities occurred after 1969. CP & L further argues that Congress had before it evidence of the utilities' lack of culpability for the contamination when it decided that the utilities should be required to contribute to the cost of decontaminating and decommissioning the enrichment facilities.

CP & L also contends that it has not and will not benefit from the cleanup of the government's enrichment facilities. In CP & L's view, it has already paid for any benefits it received from the government's uranium enrichment program in the prices it paid under its past contracts for government enrichment services. CP & L asserts that it agreed to buy uranium enrichment services from the government pursuant to fixed-price contracts that contained a provision stating that the prices paid for the enrichment services were not to exceed a "ceiling charge" specified in the contracts. It should be noted, however, that CP & L also purchased enriched uranium under bilateral contracts with third-party sources who had obtained enrichment services from the government.

Moreover, CP & L explains, in fixing the prices of its enrichment services, the government had a statutory obligation to include in such prices all costs and expenses relating to the operation of its uranium enrichment facilities. CP & L contends that the government was well aware, or should have been well aware, of the need to decontaminate and decommission its uranium enrichment facilities and of the significant cost involved in doing so. Indeed, CP & L argues, the government represented to CP & L that the prices it was charging for enrichment services included the government's cleanup costs. Accordingly, CP & L argues, it understood and relied on the fact that the prices it paid for the government's enrichment services included the cost of cleanup of the government's plants. Notwithstanding DOE's obligation to ensure the existence of sufficient funds to cover the eventual cleanup costs, and the government's representations that such costs were included in the contract prices the utilities paid for enriched uranium, CP & L contends, DOE failed to set up a fund or otherwise set aside money for the eventual cleanup costs. *National Energy Strategy (Part 2): Hearings on H.R. 145 & H.R. 788 Before the Subcomm. on Energy & Power of the House Comm. on Energy & Commerce*, 102nd Cong. 163 (1991) (hereinafter *"Hearings on H.R. 145 & H.R. 788, House Comm. on Energy & Commerce"*) (testimony of W. Henson Moore, Deputy Secretary of Energy).

CP & L further contends that the EPACT assessment only benefits the government. According to CP & L, the sole purpose of the assessment was to ensure the success of USEC, the new private corporation the government established under EPACT to take over the government's enrichment services operations, by providing the government with the best return on its commercial enrichment service venture. In CP & L's view, the assessment on past domestic purchasers of the government's enrichment services simply served to shift the government's cleanup liability to domestic utilities rather than place it on the new private corporation, where, in CP & L's view, it more properly belongs.

CP & L asserts that, contrary to the government's position, the assessment has a significant economic impact. CP & L contends that it does not recover, through fuel cost or otherwise, the time value of the money it must remit each September to DOE. Moreover, CP & L argues, the assessment diminishes the company's value as a going concern because it reduces the resale value of the enriched uranium CP & L purchased, CP & L further asserts that the assessment is a recurring liability owed by the company, which also further reduces its value as a going concern.

CP & L argues that it suffers these impacts notwithstanding its ability to pass the cost of the assessment on to its consumers as a fuel cost. CP & L claims that it has been able to include the EPACT assessment in its fuel cost thus far only with the acquiescence of state regulatory rate-setting commissions. CP & L alleges that it has no guarantee that state rate-setting commissions will continue to allow the assessment to be included in its rate base as a fuel cost. CP & L claims that, in any event, passing on the assessment re-

sults in higher rates, which in turn could result in customers seeking alternative sources of power (e.g., gas heat versus electric heat) and could ultimately lower CP & L's rate of return on its investment.

Finally, CP & L argues that if it had any reason to expect that it might be required, decades later, to pay additional sums to make up for the government's failure to account adequately for cleanup costs, CP & L would have taken other actions, such as purchasing uranium enrichment services from approved foreign governments.

## III. DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rules of the Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir.1998) (citing *Liberty Lobby*, 477 U.S. at 247, 106 S.Ct. 2505). In this connection, the moving party has the burden of establishing that there are no genuine material issues of fact in dispute and that it is entitled to judgement as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. However, "[e]ven disputed material facts will not defeat summary judgment when, taking all factual inferences in favor of

the nonmovant, the moving party is nonetheless entitled to judgment as a matter of law." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed.Cir.1998) (citing *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141 (Fed.Cir.1997)).

CP & L contends that summary judgment is premature because further fact finding through discovery is likely to confirm that Congress acted irrationally and arbitrarily in imposing an assessment on utilities that had not caused any of the contamination at the government-owned uranium enrichment facilities.[4] CP & L further contends that discovery will show that Congress' actions amount to a taking of property because the assessment causes economic harm and interferes with CP & L's investment-backed expectations.

The government contends that summary judgment should not be postponed to allow CP & L to conduct discovery into facts, which if proven true, would not alter the outcome of this dispute. The government argues that under the summary judgment standard, the court must assume as true CP & L's contentions that it did not cause any contamination and that the cleanup of the enrichment facilities will not now benefit CP & L. The government contends that Congress' legislative choice was based on other factors and that the court can decide the constitutionality of EPACT's assessment scheme on the undisputed facts presented in the parties' stipulated facts. The government notes in this connection that legislative choices are not subject to "courtroom factfinding." *Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Rather, the burden is on the party challenging the legislation to show that the choice made by Congress is irrational and arbitrary. *Id.* Finally, the government contends that

---

4. The court notes that CP & L has not filed an affidavit, as required under RCFC 56(g) and its counterpart, Fed.R.Civ.P. 56(f), supporting its request for additional discovery. *C.W. Over & Sons, Inc. v. United States*, 44 Fed.Cl. 18, 23 (1999). "A party may not simply assert that discovery is necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for

the need for discovery in an affidavit." *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1389 (Fed.Cir.1989); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed.Cir. 1988) (holding that review of discovery issue was precluded where litigant failed to invoke discovery rule in arguing to trial court that it could not properly respond to summary judgment motion without additional discovery).

even assuming that CP & L's assertions of economic harm are true, the assessment does not amount to a taking or a breach of any contract between CP & L and the government.

The court agrees with the government. Where, as here, the court must assume the facts alleged by CP & L to be true, additional discovery to confirm those facts is not required. At this stage of the proceeding, it is not the court's task to weigh the evidence. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. CP & L will be given the benefit of the doubt with regard to its factual assertions and the court will draw all legitimate inferences from those facts in favor of CP & L. *See id.; Atlas Corp. v. United States,* 895 F.2d 745, 757 (Fed.Cir.1990).

Ultimately, however, substantive law determines which facts are material, that is, which facts might affect the outcome of the action under the governing law. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. For the reasons that follow, the court finds that under the relevant substantive law, the facts CP & L seeks to establish are not "material" to the outcome of the action. If there are no material facts in dispute, additional discovery is not required. *Savoy v. White,* 788 F.Supp. 69, 73 (D.Mass.1992) ("In light of the undisputed facts, we cannot conceive of what discovery would accomplish, except to postpone the inevitable.") (citing *Santoni v. Fed. Deposit Ins. Corp.,* 677 F.2d 174 (1st Cir.1982)). Accordingly, the court concludes that it can proceed to resolve the case without requiring additional discovery.

## B. Fifth Amendment Substantive Due Process

■ At the heart of CP & L's case is its contention that the EPACT assessment amounts to a deprivation of property without due process, and thus, the assessment should be invalidated and all past payments returned.[5] In analyzing CP & L's due process claim the court is guided by the principles governing judicial review of economic legislation that is designed to adjust the "burdens

and benefits of economic life." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). In particular, economic legislation "come[s] to the Court with a presumption of constitutionality, and ... the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.* (citations omitted); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (citations omitted). The fact that the EPACT assessment applies retroactively does not change this presumption of constitutionality. *Eastern Enters. v. Apfel,* 524 U.S. 498, 528, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion) (citing *R.A. Gray,* 467 U.S. at 731, 104 S.Ct. 2709). As the Court explained in *R.A. Gray,* "[p]rovided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *R.A. Gray,* 467 U.S. at 729, 104 S.Ct. 2709.

This is not to say that retroactive legislation is favored. A plurality of the Supreme Court noted in *Eastern Enterprises* that retroactive legislation requires special scrutiny. "Our decisions ... have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Eastern Enters.,* 524 U.S. at 528–29, 118 S.Ct. 2131. The Constitution does not require, however, that Congress select "the scheme that a court later would find to be the fairest." *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). Rather, the court should make sure that both the retroactive nature of the legislation, as well as the scheme itself, are rationally tied to legitimate governmental interests. *United States v. Sperry Corp.,* 493 U.S. 52, 64,

5. There is no dispute that this court has jurisdiction to consider unlawful exactions of this nature. *See e.g., Branch v. United States,* 69 F.3d

1571, 1575 (Fed.Cir.1995); *Atlas Corp.,* 895 F.2d at 756.

110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (citing *R.A. Gray*, 467 U.S. at 730, 104 S.Ct. 2709).

CP & L contends that the EPACT assessment violates the above-noted due process principles because it is severely retroactive and imposes a liability on CP & L that was both unanticipated and unforeseeable. In addition, CP & L argues that the cost of cleanup imposed on the domestic utilities is unfair because the utilities did not directly cause any of the contamination at the enrichment facilities and the services performed on behalf of the domestic utilities did not measurably contribute to the problem given the pre-existing contamination at the facilities. CP & L further argues that the assessment is not tied to any benefit received by CP & L, in that domestic utilities will not benefit from the cleanup itself and the utilities have already paid for any benefit received from the government under their fixed-price contracts. For the reasons that follow, CP & L's due process claim fails.

First and foremost, even assuming all of the above-alleged facts to be true, CP & L has not shown that Congress acted irrationally in imposing a portion of the cleanup costs on the utilities that used, and therefore "benefitted," from the government's uranium enrichment services. A review of the legislative history surrounding EPACT plainly demonstrates that Congress carefully considered various options for funding the cleanup of the nation's enrichment facilities before deciding upon the assessment scheme at issue here.

In 1991, several bills were introduced in the Senate that would have placed the cost of cleanup on those purchasers of uranium enrichment services who would be purchasing those services from USEC, the new private corporation Congress planned to establish to take over its enrichment services operations. *See* National Energy Security Act of 1991, S. 341, 102d Cong. (1991); Comprehensive Uranium Act of 1991, S. 210, 102d Cong. (1991). Later, in 1992, other proposals emerged that called for an assessment on all nuclear electric generators as a way of funding the cleanup of the government's facilities. *See Comprehensive National Energy Policy Act: Hearings on H.R. 776 Before the House Comm. on Ways & Means*, 102d Cong. 67 (1992) (hereinafter *"Hearings, House Comm. on Ways & Means"*) (testimony of Alan J. Wilensky, Deputy Assistant Secretary of the Treasury). At the same time, others in Congress proposed the creation of a special fund to pay for the cleanup, with contributions coming from a combination of sources including general revenues, current purchasers of enrichment services, and if necessary, past purchasers of enrichment services. *See id.* at 55–56 (prepared statement of Rep. Philip R. Sharp); Staff of Senate Comm. On Energy & Natural Res., 103d Cong., *Legislative History of The Energy Policy Act of 1992*, Vol. 4, at 2965 (Comm. Print 1994) (hereinafter "Staff Report").

These various ideas were discussed in hearings before several committees of Congress, including the House Ways and Means Committee. During the hearings, Congress heard from several public interest groups which strongly urged Congress to pass the cleanup costs on to the domestic utilities that had benefitted from the government's uranium enrichment services in the past. *Hearings, House Comm. on Ways & Means.* 102d Cong. 188–96, 203–04 (testimony of National Taxpayers Union and coalition of environmental groups). Congress also heard the views of those who strongly opposed an assessment on past domestic utility purchasers on the grounds that the utilities were not in any way responsible for the contamination, nor did their past purchases contribute to the contamination. *Id.* at 175–77 (statement of Joseph M. Farley, CEO, Southern Nuclear Operating Co.); *Domestic Uranium Industry & Enrichment Program: Hearings on H.R. 4934 & H.R. 5181 Before the Subcomm. on Energy & Power of the House Comm. on Energy & Commerce*, 100th Cong. 322–23 (1988) (responses of Bill Lee, CEO, Duke Power Co., to questions by Rep. Sid Morrison). Ultimately, after considering these conflicting viewpoints, Congress enacted EPACT, which imposed a portion of the cleanup costs on the domestic utilities that had used and benefitted from the government's enrichment services in the past.

Although the conference report on EPACT does not itself address the assessment on

domestic utilities, there are numerous statements from members of the Conference Committee and floor managers of the bill that discuss the rationale behind the EPACT assessment on domestic utilities.[6] The most comprehensive explanation of the final compromise set forth in EPACT is given by Representative Phillip R. Sharp, a member of the Conference Committee and floor manager of the legislation. *See* Staff Report, Vol. 6, at 4553–54. On the floor, Representative Sharp explained that the Conference Committee had determined that the historic domestic utility users should help pay for the cleanup because that had been the understanding established under the original Atomic Energy Act. *Id.* These statements echoed Representative Sharp's earlier statements before the House Ways and Means Committee, where he explained:

> the prevailing view on the allocation of costs of cleaning up those plants is that it should be based on the benefits received from the program. Historical production from these plants has been divided almost evenly between the Government and Commercial sections.... the current program is only serving commercial nuclear customers.

*Hearings, House Comm. on Ways & Means,* 102d Cong. 55.[7]

Indeed, in testimony before the House Ways and Means Committee, representatives of domestic utilities, including Commonwealth Edison Company, Southern California Edison Company, the Southern Nuclear Operating Company, the American Nuclear Energy Council and the Edison Electric Institute, indicated in connection with a proposal that would have looked to past domestic utility users as a possible source of funding that the industry was willing "to pay a fair share of the D & D for [cleaning up the government enrichment] facilities." *Id.* at 182. In-

dustry representatives went on to explain that, in their view, a "fair program must specify a realistic and equitable ratepayer allocation and establish a cap to protect ratepayers from being assessed more than their fair share of costs." *Id.* at 181. They went on to recommend that the Congress adopt a scheme that would cap domestic utility contributions based on past use at $2.5 billion over fifteen years. *Id.* at 178–83. And Congress, in enacting EPACT, adopted this industry-recommended cap. Representative Robert S. Walker, another member of the Conference Committee, indicated that the cap was a critical component of the compromise that led to the domestic utilities' share. *See* Staff Report, Vol. 6, at 4567. The court finds Congress' action in adopting the approach advocated by the affected industry representatives to be persuasive evidence of its rationality.

The legislative history also shows that Congress' decision to allocate a share of cleanup responsibility to domestic utility users was supported by testimony regarding the benefits those utilities had received in the past from the government's enrichment services. This included testimony relating that the government had expended billions of dollars in plant and equipment upgrades for its commercial customers and that the government had for years provided the private sector with reliable enrichment services. *Hearings on H.R. 145 & H.R. 788, House Comm. on Energy & Commerce,* 102d Cong. 188 (statement of National Taxpayers Union); H.R.Rep. No. 102–474, pt. 8, at 77, 1992 U.S.C.C.A.N. at 2295. In fact, domestic utility representatives conceded in their testimony before Congress that "the government and industry have existed symbiotically, each benefitting from the other." *Hearings, House Comm. on Ways & Means,* 102d Cong. 180.

---

**6.** The Federal Circuit has recognized that remarks by conference committee members are treated like the conference report itself. *New Mexico v. United States,* 831 F.2d 265, 268–69 (Fed.Cir.1987) (citations omitted); 2A Norman J. Singer, *Sutherland on Statutory Construction* ¶ 48.14, at n. 5 (5th ed.1992).

**7.** This view comports with the House Interior Committee which explained in its report on the

proposed legislation: "Part of the justification for a special assessment on nuclear utilities stems from the legal requirement that the program recover its costs.... DOE has not collected or set aside funds for the purpose of old plant cleanup." H.R.Rep. No. 102–474, 102d Cong., pt. 8, at 78, *reprinted in,* 1992 U.S.C.C.A.N. 2282, 2296.

Based on the foregoing history, it is clear that Congress' decision to look to those who had benefitted from the government's enrichment services in the past to help pay for the cleanup of the government's enrichment facilities was not irrational. As the Supreme Court stated in *Sperry*, "[i]t is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." *Sperry*, 493 U.S. at 65, 110 S.Ct. 387.[8] Congress considered evidence that the domestic utilities, which were past purchasers in the government's enrichment program, while not responsible for the contamination, had nevertheless benefitted from the government's activities. This led Congress to reasonably conclude that they should bear a portion of the cleanup costs.

Second, CP & L has not shown that the allocation between the government and the past domestic utility purchasers is arbitrary. CP & L contends that the 32%–68% split between the domestic utilities and the government is not supported because the domestic utilities did not cause or contribute in any way to the contamination at the government's facilities and will not benefit from the cleanup now. This contention is not relevant, however, because as noted above, the EPACT allocation scheme is not based on fault or current benefit. Rather, the EPACT assessment on domestic utilities is based on the "benefit" those utilities received from the use of government uranium enrichment services.

Contrary to CP & L's assertions, the fact that the domestic utilities paid the government for these services does not mean that the assessments exceed the benefits they received under the contracts. Courts do not require that the burden imposed by legislation be precisely proportionate to the benefits obtained. "All that we have required is that the user fee be a fair approximation of the cost of benefits supplied." *Sperry*, 493 U.S. at 60, 110 S.Ct. 387 (citation and internal quotations omitted). The fact that the domestic utilities' past purchases were nearly equal to the government's past purchases, yet their share of the cleanup cost is less than 50%, is persuasive evidence of the "rationality" of the allocation. *See Hearings, House Comm. on Ways & Means,* 102d Cong. 55 (testimony of Rep. Sharp) (quoted *supra* pp. 43–44). In such circumstances, the court cannot conclude that the domestic utilities' 32% share, of which CP & L pays only a portion based on its historic use, is disproportionate to the benefits received under the government's commercial enrichment program.

Moreover, the allocation between the domestic utility users and the government cannot be looked at in a vacuum, but must be examined in light of the cap placed on the domestic utility share and the pass-through provision, which allows the utilities to pass on the EPACT assessment to their ratepayers. The significance of the $2.5 billion cap is notable. As explained above, in testifying about the legislation, utility industry representatives made plain that the utilities very much wanted a "cap" on their share of the cleanup liability. Thus, while the utility representatives contended that $2.5 billion might be higher than the domestic utilities' estimated share of the liability, the representatives said that they were "willing to accept this compromise in the interest of providing certain liability levels." *Hearings, House Comm. on Ways & Means,* 102d Cong. 182. Here, the industry representatives recog-

---

8. In this connection, CP & L's contention that EPACT is the only scheme to impose an assessment based on past benefit is not supported. In *Sperry*, the plaintiff challenged an assessment on an award granted by the Iran–United States Claims Tribunal, which was established to settle American claims against Iran. *Sperry*, 493 U.S. at 58, 110 S.Ct. 387. The Supreme Court rejected the plaintiff's contention that the assessment violated due process because it applied to awards made prior to enactment of the statute, finding that retroactive application of the assessment

was "justified by a rational legislative purpose." *Id.* at 64–65, 110 S.Ct. 387; *see also Pub. Serv. Co. of Colo. v. Fed. Energy Regulatory Comm'n,* 754 F.2d 1555, 1565 (10th Cir.1985) (holding that fee assessed for the benefit received as result of release of stored water from reservoir was not a taking); *United States v. Frame,* 658 F.Supp. 1476, 1479–80 (E.D.Pa.1987) (holding that assessment on beef industry for promotion and research does not constitute unlawful exercise of Congress' taxing authority).

nized the value of having a capped share, particularly where the full cost of the cleanup was yet unknown.[9] Indeed, the representatives noted that a cap preserved the "fairness" of the scheme by ensuring that utility ratepayers pay no more than their "fair share" toward cleanup. *Hearings, House Comm. on Ways & Means*, 102d Cong. 181 (quoted *supra* pp. 43–44).

Finally, the utilities' ability to pass on the assessment to their ratepayers is also a significant factor supporting the rationality of the EPACT scheme. As discussed at greater length with regard to CP & L's takings claim, see discussion *infra* Part C, Congress expressly provided that EPACT assessments "shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost." 42 U.S.C. § 2297g–1(g). Congress was aware of the utilities' unique ability to pass on the assessment to their ratepayers and recognized that the pass-through provision would essentially place the utilities in the position they would have been had they been paying toward cleanup all along.

■ For all of the above-discussed reasons, CP & L's due process claim fails. Those attacking the rationality of economic legislation have the burden "to negative every conceivable basis which might support it." *Beach Communications, Inc.*, 508 U.S. at 315, 113 S.Ct. 2096 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). Here, CP & L has failed to meet that burden. Congress had a plausible reason to pass this legislation. And, Congress' decision to apply the scheme retroactively is

rationally supported. In such circumstances, this court agrees with the conclusions of the other members of this Court who have also found that EPACT does not violate due process. *See, e.g., Commonwealth Edison Co.*, 46 Fed.Cl. at 44–45, *Maine Yankee*, 44 Fed. Cl. at 381. Accordingly, the government's motion for summary judgment on CP & L's substantive due process claim is granted.

## C. Takings Analysis

■ In addition to its due process claim, CP & L argues that the burden imposed by Congress under EPACT is so onerous that it rises to the level of a taking under the Fifth Amendment of the Constitution. The takings clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." CP & L contends that the EPACT assessment effects an impermissible taking of its property.[10] Notwithstanding its ruling on CP & L's due process claim, the court cannot ignore the possibility that the EPACT assessment, as applied to CP & L, is so disproportionate to its experience that it amounts to a regulatory taking. Accordingly, the court will analyze CP & L's takings claim "by applying the three factors that traditionally have informed our regulatory takings analysis": (1) the severity of the economic impact of the assessment; (2) the Act's effects on CP & L's investment-backed expectations; and (3) the nature of the governmental action in relation to plaintiff's experience. *Eastern Enters.*, 524 U.S. at 529, 118 S.Ct. 2131; *accord Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (citing *Penn Central*

---

**9.** Importantly, Congress heard testimony from numerous sources on the cost of cleanup. DOE contractors estimated the cost could exceed $20 billion over forty years. H.R.Rep. No. 102–474, 102d Cong., pt. 8, at 77, *reprinted in* 1992 U.S.C.C.A.N. at 2295. Other estimates were between $3 billion and $30 billion dollars. *Hearings on H.R. 145 & H.R. 788, House Comm. on Energy & Commerce*, 102d Cong. 162 (statements of DOE official and National Tax Payers Union, respectively). Given the wide disparity in clean-up cost estimates, Congress' willingness to agree to a cap on the utility share is particularly significant.

**10.** Contrary to the government's suggestion, CP & L does not argue that the assessment itself constitutes a taking of money. Rather, CP & L claims that the assessment has caused a diminution in the value of its business without justification. This concession is compelled by *Sperry*, 493 U.S. at 62 n. 9, 110 S.Ct. 387, in which the Supreme Court rejected a claim that a statute imposing a strictly monetary liability was akin to a "permanent physical occupation" of the plaintiff's property and thus a per se taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). *Accord Branch*, 69 F.3d at 1576–77; *Atlas Corp.*, 895 F.2d at 756.

*Transp. Co. v. United States*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

### 1. Economic Impact

CP & L argues that the EPACT assessment amounts to a taking because it imposes a substantial economic burden on its business without justification. The government does not dispute that CP & L has contributed over $38.8 million in EPACT assessments as of February 1999, the date of its amended complaint. Instead, the government contends that because CP & L has been able to recover the full amount of the assessment through the rates it charges its customers, the economic impact of the assessment on CP & L, if any is slight and does not impose a significant burden. CP & L responds that the pass-through provision does not protect against a taking because CP & L is only able to recover the assessment from its ratepayers at the largesse of the state regulatory commissions, and that it may not be able to do so in the future.

The court agrees with the government that CP & L's ability to recoup the assessment from its ratepayers is a significant factor to consider in evaluating economic impact. First, the Supreme Court has established that mitigating factors are significant in determining whether a statute effects a taking. *See Penn Cent.*, 438 U.S. at 137, 98 S.Ct. 2646 (holding that plaintiff's ability to recoup lost profits through transferred development rights "undoubtedly mitigate whatever financial burdens the law has imposed ... and, for that reason, are to be taken into account in considering the impact of a regulation"); *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184, 1192 n. 14 (1981) (quoting *Penn Cent.*, 438 U.S. at 137, 98 S.Ct. 2646). CP & L admits that, to date, it has been able to fully recoup the amount of the EPACT assessments from its ratepayers.

Second, contrary to CP & L's contentions, the pass-through provision is not an empty promise. EPACT expressly provides that the assessment *"shall be fully recoverable in all rates in all jurisdictions in the same manner as the utility's other fuel cost."* 42 U.S.C. § 2297g–1(g) (emphasis added). This provision endeavors to ensure that the utilities themselves will not be left having to pay the assessment out of their own funds, which would directly affect their bottom line, but may instead pass the costs on to their customers. Thus, the assessment does not affect CP & L's rate of return.

Much of the concern regarding retroactive economic legislation stems from a concern that it disrupts "settled expectations." *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265–66, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Here, EPACT's pass-through provision minimizes the impact on CP & L's expectations by allowing it to recoup the assessment from its ratepayers, as a matter of law. No doubt, courts have found that the ability to recoup the cost of retroactive legislation from third parties may not be enough to overcome the legislation's economic impact in some circumstances. *See e.g., Eastern Enters.*, 524 U.S. at 531, 118 S.Ct. 2131; *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 46–47, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). However, in contrast to cases where recoupment was possible but not assured, recoupment under EPACT is essentially guaranteed. *See* 42 U.S.C. § 2297g–1(g).[11] This is particularly true in light of the fact that CP & L's rates are subject to regulatory rate setting, which is discussed in more detail below. *See* discussion *infra* pp. 48–49. In such circumstances, CP & L's claims of economic hardship based on the impact of the assessment itself are unpersuasive.

CP & L's additional claims of economic harm also fail to rise to the level of a compensable taking. CP & L argues that be-

---

11. CP & L argues that the pass-through provision may not provide for full recovery in all circumstances because EPACT assessments must be treated as a fuel cost, and a state rate-setting commission need not allow 100% recovery of a utility's total fuel costs. To date, this has not occurred and CP & L has been able to fully recover the EPACT assessment. The court will not speculate as to what the result would be if CP & L could show that it has not recovered the full amount of the assessment. If circumstances were to change, CP & L may be able to reassert their taking claim. *See Penn Cent.*, 438 U.S. at 138 n. 36, 98 S.Ct. 2646.

cause it must pay the assessment in a lump sum it suffers the lost time value of money. CP & L argues further that the assessment has put the company at a potential competitive disadvantage against utilities that use fuel from other sources and are not subject to the EPACT assessment. Finally, CP & L argues that the assessment has diminished the resale value of the fuel, because of the liability it carries, and that this liability has diminished the value of the company as a whole.

■ The court is not persuaded by any of these arguments. Well-established precedent holds that, in the area of regulatory takings, some economic impact is permissible under the Constitution:

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law, ... and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example.

*Penn Cent.*, 438 U.S. at 12, 98 S.Ct. 26464 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922)) (internal quotations omitted). In order to prove that an otherwise valid regulation has effected a taking, the claimant must establish more than a "mere diminution in the value of property." *Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust of S. Cal.*, 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (holding that having to pay out 46% in shareholder equity did not amount to a taking); *accord Penn Cent.*, 438 U.S. at 137, 98 S.Ct. 2646 (finding no taking where plaintiffs failed to demonstrate regulation "denied all use" of pre-existing air rights) Regardless of whether the assessment causes some diminution in the value of CP & L's business, CP & L has failed to show how the incidental costs of the assessment create more than a "mere diminution" in value.

■ In this connection, the court finds CP & L's unique status as a regulated utility highly relevant. The Supreme Court has noted that the limitations placed on the rate of return that utilities may collect create unique takings questions. *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). In *Duquesne*, the Supreme Court made clear that, in the context of a utility's challenge that the exclusion of a particular cost from its rate base amounted to a taking, the utility must show that the impact of the government rate-setting action is so great as to interfere with the utility's ability to make a reasonable rate of return. *Id.* at 310, 109 S.Ct. 609. While the present case does not involve government rate setting, and therefore *Duquesne* is not controlling, it is instructive. In particular, *Duquesne* suggests that in order for CP & L, as a regulated utility, to show that the EPACT assessment effects a taking, it must show that the assessment has interfered with CP & L's right to receive a reasonable rate of return. *Id.* at 312, 109 S.Ct. 609. As a regulated utility, CP & L is not entitled to a maximum rate of return. *Id.* at 307, 109 S.Ct. 609 ("[T]he Constitution protects utilities from being limited to a charge ... which is so 'unjust' as to be confiscatory.") (citation omitted).

Here, CP & L has not made such a showing, nor could it. Like the plaintiffs in *Duquesne*,

> [n]o argument has been made that [the assessment] jeopardize[s] the financial integrity of [CP & L], either by leaving them insufficient operating capital or by impeding their ability to raise future capital. Nor has it been demonstrated that these rates are inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme.

*Id.; accord Atlas Corp.*, 895 F.2d at 758 (finding no economic impact where plaintiff corporation failed to show regulation made it unprofitable). At best, CP & L's arguments raise the specter of harm that might occur at some future date. Speculation that the impact of the assessment might sometime in the future cause harm is not sufficient to establish a taking today. *Penn Cent.*, 438 U.S. at 138 n. 36.

## 2. *Investment-backed expectations*

█ With respect to the second inquiry, CP & L argues that the EPACT assessment interferes with its investment-backed expectations because it understood that the prices it paid the government under the fixed-price enrichment services contracts already included the costs of decontamination and decommissioning of the plants. CP & L's reliance on its contractual relationship with the government is overstated. The Supreme Court has stated that, "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations ... or impose[s] a new duty of liability based on past acts." *Connolly*, 475 U.S. at 223, 106 S.Ct. 1018; *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646 (holding that a taking is less likely when the "interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good"). The fact that CP & L paid for uranium enrichment services purchased from the government and third-party sources under fixed-price contracts, by itself, does not necessarily prove that the EPACT assessment so interferes with CP & L's investment-backed expectations as to amount to a taking.

Although CP & L may not have expected to pay more than the contract price for the government's enrichment services, as discussed below with respect to CP & L's breach claim, see discussion *infra* Part D, CP & L cannot argue that the contracts guaranteed that it would never be asked to pay for cleanup of the enrichment facilities. Indeed, from the inception of the government's commercial uranium enrichment program, the Atomic Energy Act contemplated that utility purchasers would pay their share of the costs of providing enrichment services. *Hearings, House Ways & Means Comm.*, 102d Cong. 50 (prepared testimony of Rep. Sharp); H.R.Rep. No. 102–474, 102d Cong., pt. 8, at 78, *reprinted in* 1992 U.S.C.C.A.N. at 2296 (citing section 161(v) of the Atomic Energy Act, 42 U.S.C. § 2201v (1970)). Again, CP & L's participation in a highly regulated industry is a critical factor in determining whether EPACT impermissibly interferes with CP & L's investment-backed expectations. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. 2264 (citations omitted); *Atlas Corp.*, 895 F.2d at 758. As a participant in a highly regulated field, CP & L cannot expect to be immune from legislation aimed at addressing problems arising in the industry, such as the government's solution to the unanticipated size of the cleanup cost of the enrichment plants.

## 3. *Nature of Governmental Action*

█ The final factor in the takings analysis is the nature of the governmental action in relation to the plaintiff's experience. As noted above, the takings clause permits some governmental interference with property rights where it "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good," so long as the government is not appropriating the property for "its own use." *Connolly*, 475 U.S. at 225, 106 S.Ct. 1018 (citations omitted). CP & L argues that the assessment is improper because it is retroactive and was designed to benefit a newly formed government enrichment service corporation at the expense of past domestic purchasers.

In support of its contention that the government action is not justified, CP & L relies extensively on *Eastern Enterprises,* in which the Supreme Court held the Coal Industry Retiree Health Benefit Act ("Coal Act") to be an unconstitutional taking. *Eastern Enters.*, 524 U.S. at 529, 118 S.Ct. 2131. The plurality in *Eastern Enterprises* determined that the liability imposed on the plaintiff by the Coal Act amounted to a taking because the Coal Act violated "fundamental principles of fairness underlying the Takings Clause," in that it "single[d] out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused." *Id.* at 537, 118 S.Ct. 2131. In this connection, the plurality found that Eastern's decision to leave the industry over thirty years before liability was imposed

and before others in the industry had made the commitment to provide benefits to employee-dependents was persuasive evidence of "unfairness." *Id.* at 530–31, 118 S.Ct. 2131. Accordingly, the Court found that the liability imposed on Eastern by the Coal Act was completely disproportionate to its past conduct and therefore, as applied to Eastern, amounted to a taking. *Id.*

Contrary to CP & L's assertions, the relationship between the assessment and CP & L's experience with and nexus to the government's enrichment facilities is certainly not as attenuated as the relationship between the coal company and employee-dependents discussed in *Eastern Enterprises.* CP & L is being asked to contribute to the 32% of the cleanup cost shared by past domestic purchasers, based on its own historic pro-rata use of the government's enrichment services purchased over a twenty-year period. Unlike in *Eastern Enterprises,* the relationship between CP & L and the government during this period is largely unbroken. CP & L purchased government-enriched uranium from the government and third-party sources who had also purchased from the government until approximately 1993. Moreover, the EPACT assessment imposed on CP & L is limited to the proportion of government-enriched uranium it purchased for use in the production of nuclear energy, and is thus tied directly to its experience as a beneficiary of the government's enrichment program. And as discussed, CP & L has been able to fully recover its contribution. These factors make the nature of the impact of EPACT, as applied to CP & L, markedly different than the nature of the impact of the Coal Act on the plaintiff in *Eastern Enterprises.*

Finally, CP & L's contention that the EPACT assessment effectuates a taking because Congress is forcing the utilities to shoulder the cost of the clean up in order to make the government's decision to sell its enrichment program to private investors more profitable is not accurate. Admittedly, courts will look askance at legislative schemes that take resources from a class of private parties with the sole justification of benefitting the government. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 163, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), the Supreme Court held that a statute that appropriated interest from a court interpleader fund solely for the state's own use, that was not reasonably related to the cost of using the courts, effected an unconstitutional taking. However, the principle set forth in *Webb's* does not apply in a case such as the one at bar, where the assessment exacted is not solely for the government's benefit, but is reasonably related to the claimant's benefit. The Supreme Court has made it equally clear that the government has the ability to defray costs of a program without committing a taking by spreading such costs among those who benefitted from the program. *Sperry,* 493 U.S. at 65, 110 S.Ct. 387; *Yankee Atomic,* 112 F.3d at 1576 n. 6 (recognizing that "the costs of large, unrecognized societal problems are frequently spread among those who benefit[t]ed from the source of the problem").

For all of these reasons, the government is entitled to summary judgment on CP & L's Fifth Amendment taking claim.

## D. Breach of Contract

Finally, CP & L argues that the EPACT assessment results in a breach of the contracts made between CP & L and the government for enrichment services. The contracts CP & L relies on include contracts entered prior to 1984, a 1984 Utilities Services Contract, and a 1984 Settlement Agreement it entered with the government that absolved plaintiff of all further liability for the costs of the enrichment services beyond what was contracted for and paid by CP & L.

■■■ As noted, the Federal Circuit addressed a breach of contract claim based on contracts between the government and another utility in *Yankee Atomic,* 112 F.3d at 1569. In resolving plaintiff's claim in that case the court applied "two related bodies of law: the sovereign acts doctrine and the unmistakability doctrine." *Id.* at 1574. Applying the sovereign acts doctrine, the court found that the statute was a proper exercise of sovereign power because, "[r]ather than targeting those utility companies that had prior contracts with the Government, the Act targets whichever utility eventually used and

benefit[t]ed from the DOE's enrichment services." *Id.* at 1575. In light of this finding, the court concluded that the EPACT assessment "constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577. Bound by the Federal Circuit's decision, this court also concludes that the EPACT assessment is not a retroactive price increase on CP & L's fixed-price contracts with the government. This conclusion does not, however, end the court's inquiry.

The key issue the court must now decide is whether the additional contracts identified by CP & L contain an unmistakable promise that the government will not impose a general assessment on users of the government's enrichment services to recover a portion of the costs of decontaminating and decommissioning the government's uranium enrichment facilities. *Id.* at 1579. In *Yankee Atomic,* the court concluded that the contracts between Yankee Atomic and the government included no such promise. *Id.* at 1580. The court here also fails to find such a promise existed between the government and CP & L.

None of the provisions of the pre–1984 contracts, on which CP & L relies, establishes an unmistakable promise on behalf of the government not to impose a later tax on CP & L for the costs of decontaminating and decommissioning the government's enrichment facilities. Like the contracts in *Yankee Atomic,* CP & L's contracts contain provisions stating that enrichment services are to be provided at a fixed price based on an established pricing policy, which by statute must account for all of the costs of the enrichment services, and that the prices charged are not to exceed a set "ceiling charge." *Id.;* Contract Nos. AT–(40–1)–4134–DUE, AT–(40–1)–4195–DUE, AT–(40–1)–4342–DUE (later designated DE–SC05–72UE04342). Based on *Yankee Atomic,* the court does not find these provisions to make an unmistakable promise not to impose a later assessment for decontamination and de-

commissioning. *Yankee Atomic,* 112 F.3d at 1580.

CP & L argues further that in 1984, it entered into the government's new "Utility Services Contract," not addressed by the court in *Yankee Atomic,* which promised "predictable" and "competitive" prices. The pricing provisions of this contract are not appreciably distinct from the provisions of CP & L's earlier contracts or those at issue in *Yankee Atomic.* Like the earlier contracts, the Utility Services Contract provides that enrichment services shall be provided at a fixed price based on an established pricing policy, "in effect at the time of performance." Contract No. DE–SC05–84UE07505, Art. I, ¶ 8. Contrary to CP & L's assertions, the government fulfilled the promises made in the 1984 contract by providing CP & L enriched uranium at a fixed price under the contract. The Utility Services Contract does not contain an additional promise on behalf of the government that it would not impose an assessment on CP & L for future cleanup of the enrichment facilities.

Nor is the court persuaded that the Settlement Agreement, entered by CP & L and the government for the purpose of terminating the original contract, contained a promise not to impose an assessment for decontamination and decommissioning of the enrichment facilities. In particular, CP & L relies on language stating, "the Government unconditionally waives any claim against [CP & L] by reason of the termination of the contract and releases it from any and all obligations arising under the contract by reason of its termination." In light of the fact that the EPACT assessment is an independent liability imposed on all uranium enrichment users, irrespective of whether those services were purchased from the government or from third party sources, the court concludes it is not an "obligation arising under the contract," and therefore is not covered by the waiver in the settlement agreement. *See Yankee Atomic,* 112 F.3d at 1575, 1580.

The court notes that other members of this Court have addressed similar arguments by other utility-plaintiffs, that the Utility Services Contract and the Settlement Agreement provisions establish a breach of con-

**52**

tract claim, despite the holding in *Yankee Atomic*, and have reached the same conclusion. *See, e.g., Commonwealth Edison,* 46 Fed.Cl. at 46–47; *Maine Yankee,* 44 Fed.Cl. at 377. Therefore, consistent with the holdings in *Maine Yankee* and *Commonwealth Edison,* the court concludes that the additional agreements cited by CP & L do not establish that the EPACT assessment is a breach of contract.

## CONCLUSION

For the foregoing reasons, the court holds that the EPACT assessment does not amount to a violation of due process, a taking, or a breach of contract. Accordingly, the court **GRANTS** summary judgment in favor of the government. The Clerk is directed to enter judgment accordingly. Each party to bear its own costs.