Boston Gas Company *vs.* Department of Public Utilities.

Suffolk. May 6, 1982. — October 28, 1982.

Present: Hennessey, C.J., Wilkins, Nolan, & O'Connor, JJ.

*Constitutional Law,* Public utilities, Special law, Equal protection of laws, Separation of powers of government, Separable portion of statute. *Public Utilities. Statute,* Special law, Severability, Retrospective statute.

A special legislative act prohibiting a named natural gas distribution company from collecting from its customers the unrecovered extraordinary costs of gas which it supplied to them during an acute shortage, until the Department of Public Utilities concluded a proceeding to determine the manner in which the extraordinary costs would be borne, did not violate the standing laws provision in art. 10 of the Massachusetts Declaration of Rights. [536-539]

This court declined to decide, on the record before it, the constitutionality of language in a special legislative act purporting to require a named natural gas distribution company to bear the costs of a management audit by the Department of Public Utilities respecting the company's operations during an acute natural gas shortage [539-540]; however, this language was severable from the other provisions of the act [540].

A special legislative act reversing an interim decision of the Department of Public Utilities and prohibiting a named natural gas distribution company from collecting from its customers the unrecovered extraordinary costs of gas which it supplied to them during an acute shortage, until the department concluded a proceeding to determine the manner in which the extraordinary costs would be borne, did not violate the separation of powers mandated by art. 30 of the Massachusetts Declaration of Rights, inasmuch as the act merely determined who shall hold the funds during the departmental proceeding and did not affect the department's power to render a final decision therein. [540-542]

Statute 1981, c. 604, which prohibited a named natural gas distribution company from collecting from its customers certain extraordinary charges until the conclusion of an investigative proceeding by the Department of Public Utilities did not operate retrospectively so as to require the company to refund that portion of such charges collected pursuant to an interim order of the department before the act's effective date. [542]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 8, 1981.

The case was reported by *Liacos, J.*

*John M. Stevens (L. William Law* with him) for the plaintiff.

*Paul W. Johnson,* Assistant Attorney General (*Thomas A. Barnico,* Assistant Attorney General, with him) for the defendant.

NOLAN, J. The Boston Gas Company (Company) filed a complaint in the county court on December 8, 1981, seeking declaratory and injunctive relief against the enforcement of St. 1981, c. 604 (Act). The full text of c. 604 is set out below.[1] Following a hearing, a single justice denied the Company's request for a temporary restraining order. The Department of Public Utilities (Department) filed an answer and counterclaim, and a motion to dismiss the complaint. The counterclaim seeks a declaration that the Act be given retroactive effect. At a hearing on the Department's motion to dismiss and the parties' motions for summary judgment, the single justice reserved and reported the following issues to the full court for decision.

The issues, as reported, are:

"a. Whether the Court has, and should in its discretion exercise jurisdiction over those claims by Boston Gas which this reservation and report presents for decision.

---

[1] Chapter 604 reads: "Section 1. Notwithstanding the provisions of any general or special law to the contrary, the Boston Gas Company shall be prohibited from recovering any expenses incurred as a result of an undercollection of billing to its customers during the natural gas crisis of the winter of nineteen hundred and eighty and nineteen hundred and eighty-one prior to the completion of the investigation of the department of public utilities as to the prudence of said company's management practices during said crisis.

"Section 2. The department of public utilities is hereby authorized and directed to conduct a management audit of the Boston Gas Company and report the findings thereof to the clerks of the house and senate of the general court not later than April first, nineteen hundred and eighty-two. The department of public utilities is hereby further authorized and directed to assess fifty thousand dollars against the Boston Gas Company for the cost of the audit, and said fifty thousand dollars is to be borne by the stockholders of said company."

"b. Whether the claims by Boston Gas which this reservation and report presents for decision should be dismissed in accordance with M. R. Civ. P. 12(b)(6).

"c. Whether the Act violates the standing laws provision of Article 10 of the Declaration of Rights of the Massachusetts Constitution, regardless of whatever facts other than the agreed facts might support the constitutionality of the Act under any applicable standard of judicial scrutiny, because (1) the Act identifies Boston Gas, the only entity to which it applies, by name, rather than by non-identifying terms such as could cause the Act to apply, at least potentially or theoretically, to more than one entity or (2) the Act forbids only Boston Gas to collect the unrecovered cost of gas which it supplied to its customers between July 1, 1980, and June 30, 1981, after the Department previously had allowed all privately owned gas distribution companies in Massachusetts to collect such costs.

"d. Whether the Act violates Article 30 of the Declaration of Rights of the Massachusetts Constitution regardless of whatever facts other than the agreed facts might support the constitutionality of that legislative judgment.

"e. Whether the Act requires Boston Gas to refund that portion of its undercollection from 1980-81 that it recovered between September 1, 1981, and December 7, 1981."

The parties have filed a statement of agreed facts.[2] The Company is one of ten privately owned gas distribution companies operating in Massachusetts. It serves customers in Boston as well as in seventy-three cities and towns near Boston. On January 10, 1981, the Lowell Gas Company and the Cape Cod Gas Company notified their respective customers than an energy emergency existed, and advised their customers to restrict their use of gas immediately. In addition, these companies asked their commercial and industrial customers, as well as gas-heated schools, to be

---

[2] The Company also has agreed that the Department "may hypothesize any other facts which are not inconsistent with the agreed facts and which may have been available to and not irrationally accepted by the Legislature in considering the enactment of St. 1981, c. 604."

closed on January 12 and 13, 1981. On January 13, 1981, the Boston Gas Company notified State officials that its gas supplies were critically low. On that day, the Governor declared an energy emergency (pursuant to G. L. c. 25A, § 8, inserted by St. 1979, c. 796). The Governor ordered that gas-heated schools be closed Statewide on January 16, 1981, and that commercial and industrial customers lower their thermostats. On January 16, 1981, the Department initiated an investigation (D.P.U. 555) of the reasons for, or cause of, the shortage of natural gas throughout the Commonwealth supplied by all gas companies under the Department's jurisdiction during the winter of 1980-1981. At the public session opening the investigation, the chairman of the Department indicated that the purpose of the investigation was to determine the causes of the shortage, to identify the additional costs incurred by the companies in obtaining emergency supplies, and ways to prevent the recurrence of the situation. As to the causes of the shortage, the Department proposed to examine the adequacy of the planning procedures of the companies involved, policies of these companies regarding the addition of new customers, and provision for service to "interruptible" customers.[3] As to the increased costs associated with purchasing supplemental gas supplies on an emergency basis, the chairman indicated that the Department would determine the manner in which any extraordinary costs incurred as a result of the emergency would be borne, either by the customers or the shareholders of the companies involved.

The ability of the companies to recover the cost of gas supplied to their customers during 1980-1981 was governed by their rate tariffs on file with the Department. G. L. c. 164, § 94. Each tariff contains a cost of gas adjustment clause (CGAC) which governs the manner in which com-

---

[3] Interruptible gas service is provided to customers with the understanding that the gas supply can be curtailed or suspended on very short notice by the gas company. Interruptible customers are typically industrial or commercial companies or other nonresidential users that have equipment to use an alternative fuel during the periods of interruption.

panies may pass along to their customers increases or decreases in the price which the companies pay for gas. During the period from July 1, 1980, through June 30, 1981, the customers were not billed the full cost to the companies of the gas which they received.

Prior to December 7, 1981, the Department permitted all gas distribution companies in Massachusetts to begin to collect the unrecovered cost of gas from 1980-1981, during the twelve months beginning September 1, 1981. This permission was subject to the express condition that, if the Department were to determine in the course of its investigation into the gas shortage of January, 1981, or in any related adjudicatory proceeding, that any of the costs recovered in this manner had been imprudently incurred, the companies would be required to refund the appropriate amounts together with interest at the prime rate. The Department granted such conditional permission to the Company on August 31, 1981.

On September 1, 1981, pursuant to the permission granted by the Department, the Company commenced recovery of its undercollection from 1980-1981. Of its total undercollection of $46,516,432, the Company represents that it had billed the amount of $7,343,000, as of December 7, 1981. On December 7, 1981, c. 604 was signed and declared by the Governor to be an emergency law, effective immediately. By an order of that same date, the Department directed the Company to cease the collection of its unrecovered costs from 1980-1981. The Department further directed the Company to calculate its monthly CGAC factor so as to be consistent with c. 604 in every respect. The Company submitted a new cost of gas adjustment factor to the Department and has subsequently billed its customers in accordance with that factor. The Company has not refunded to its customers the undercollections from 1980-1981 which it collected between September 1, 1981, and December 7, 1981.

On March 16, 1982, the Company filed with the Department schedules of interim and permanent rates which, if

allowed in accordance with G. L. c. 164, § 94, will increase the rates which the Company charges its customers. Through its proposed rates, the Company seeks to recover, inter alia, certain extraordinary expenses associated with the unrecovered cost of gas which it supplied to its customers in 1980-1981. The Company seeks to recover the extraordinary interest expense which it incurred in 1981 as a result of the difference between the uncollected cost of gas supplied to its customers during 1980-1981, and the uncollected cost of gas which would have accrued under normal weather conditions. In addition, the Company, through its proposed rates, seeks to recover the extraordinary interest expense which it will incur in 1982 as a result of the extended delay in the Company's collection of its undercollection from 1980-1981.

1. *Availability of judicial remedy.* The Department has entered a final order enforcing the Act. The company's appeal of this order, therefore, is properly before us under G. L. c. 25, § 5.

2. *Article 10.* The Company argues that the Act violates the standing laws provision of art. 10 of the Declaration of Rights of the Massachusetts Constitution, because it singles out the Company by name for imposition of a burden imposed on none of the other gas distribution companies in Massachusetts. The first sentence of art. 10 provides: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws." We recently discussed this provision at length in *Commissioner of Pub. Health* v. *Bessie M. Burke Memorial Hosp.*, 366 Mass. 734 (1975). In that case we said that "[t]he Legislature has power, exemplified many times, to enact special or private laws, here meaning, very roughly, legislation addressed to a particular situation, that does not establish a rule of future conduct with any substantial degree of generality, and may provide ad hoc benefits of some kind for an individual or a number of them." *Id.* at 740. Thus, art. 10 is not automatically offended whenever the Legislature enacts a law which applies

only to an individual or a small number of individuals. Rather, art. 10 prohibits special legislation which "diminish[es] or defeat[s] an existing property interest" or does other injury to an individual. *Id.* at 743. The question in the case before us, then, is whether the Act diminishes or defeats an existing property interest belonging to the Company.

We first discuss § 1 of the Act. Section 1 prohibits the Company "from recovering any expenses incurred as a result of an undercollection of billing to its customers during the natural gas crisis of the winter [1980-1981] prior to the completion of the investigation of the department of public utilities as to the prudence of said company's management practices during said crisis." The amount of the Company's undercollection from 1980-1981 is $46,516,432. Prior to the enactment of this Act, the Company billed $7,343,000 of this amount. Therefore, the effect of the Act is to prohibit the Company from collecting the remaining $39 million of the undercollections until the Department completes its investigation. We think that the legislatively-mandated delay in the receipt of these funds does not violate art. 10.

The amount of the Company's undercollections is not a vested property right immune from governmental action. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as [S]tate laws — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 23, cert. denied, 423 U.S. 929 (1975), quoting from *Regents of State Colleges* v. *Roth,* 408 U.S. 564, 577 (1972). In the case before us the Department had approved a rate tariff containing a cost of gas adjustment clause (CGAC) for 1980-1981, and the Company billed its customers according to the approved rate. The Company then incurred expenses exceeding $46 million in 1980-1981, which were not covered by the approved rate. The Department authorized the Company to begin collecting this money beginning Septem-

ber 1, 1981, subject to the express condition that if the Department were to determine as a result of its pending investigation into the gas shortage of January, 1981, that any of the costs recovered had been imprudently incurred, the Company would be required to refund the appropriate amounts together with interest at the prime rate. The Department did not make a determination that the Company was entitled to the $46 million or any part of it. Rather, it simply decided that the Company would hold the money pending the outcome of the investigation which would determine whether the Company was entitled to the funds or any part of them. Until the Department has made its final determination and approved a CGAC reflecting its determination, the Company is not entitled as a matter of right to these funds.

The Company relies on *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15 (1975), for the proposition that its right to collect these funds is a property interest entitled to constitutional protection. However, that case is distinguishable because the nursing home had a valid claim of entitlement for reimbursement for its services under the rates that were then in effect. In the case before us, the Company has already collected its approved rates but its entitlement to the funds in question has not been determined by the Department.

This is not a situation where the Legislature is preventing the Company from collecting rates which have been finally approved by the Department. Therefore, we are persuaded that the Legislature did not diminish or defeat an existing property right of the Company by enacting § 1 of c. 604; consequently, it did not violate art. 10 of the Declaration of Rights. This is so because the Department has not determined that the Company is entitled to be reimbursed by its customers for the extraordinary expenses it incurred in 1980-1981. While the Department allowed the Company to begin collecting its undercollections in September, 1981, it made this authorization expressly conditional and subject to a refund with interest. Under these circumstances, the

Company was certainly on notice that these funds were not necessarily its to keep. It is well-settled that while public utilities should be permitted to charge rates which are compensatory of the full cost incurred by efficient management, they may not recover costs which are excessive, unwarranted, or incurred in bad faith. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 79 (1976); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 483-484 (1971). Apparently, serious questions exist concerning the propriety of the Company's expenditures during 1980-1981, justifying an investigation by the Department. Until these questions are resolved, the Company does not have a property right to these funds and the Legislature did not violate art. 10 by making a determination that the Company's customers were entitled to be free from these charges pending the outcome of the investigation.

Section 2 of the Act directs the Department to conduct a management audit of the Company and to report the findings thereof to the General Court. It further directs the Department to assess $50,000 against the Company for the cost of the audit, which amount is to be borne by the stockholders of the Company. This section of the Act clearly diminishes or destroys a property right of the Company. There is no question that the $50,000 is the property of the Company and the Act permanently deprives the Company of it. Section 2 directs the Company to pay the $50,000 regardless of the outcome of the audit and prior to a determination that the Company has committed any error. The legislation singles out the Company for this burdensome treatment and does not affect other companies which may be equally at fault, if the Company is at fault. We are troubled at the state of the record in this regard because there is no showing that the Company is negligent; nor does the Company come forward with evidence that it was not negligent. It may be argued that we are permitted to infer negligence by the Company by the provision in the statement of agreed facts that: "[T]he Attorney General may

hypothesize any other facts which are not inconsistent with the agreed facts . . . ." We prefer not to pass on this constitutional question on a hypothetical basis and, therefore, we decline to decide the question of the constitutionality of the second sentence of § 2 of the Act.

Since we hold that § 1 is constitutional and conclude that a portion of § 2 may or may not be constitutional, we apply the general rule: "When a court is compelled to pass upon the constitutionality of a statute and is obliged to declare part of it unconstitutional, the court, as far as possible, will hold the remainder to be constitutional and valid, if the parts are capable of separation and are not so entwined that the Legislature could not have intended that the part otherwise valid should take effect without the invalid part." *Opinion of the Justices*, 330 Mass. 713, 726 (1953). See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 659 (1981); *DelDuca* v. *Town Adm'r of Methuen*, 368 Mass. 1, 13-14 (1975). Sections 1 and 2 are, obviously, separate sections and are certainly capable of severance. Section 1, therefore, remains valid. The Company does not claim that the first sentence of § 2, which directs that the Department conduct a management audit and report the findings thereof to the General Court, is unconstitutional, and we see no vice in it. It is capable of separation from the second sentence and we find that it is valid. Accordingly, we leave the constitutionality of only the second sentence of § 2 undecided.

3. *Article 30.* The Company next argues that § 1 violates the separation of powers required by art. 30 of the Declaration of Rights of the Massachusetts Constitution,[4] because it dictates the outcome of a pending administrative proceeding to the economic detriment of the Company. We do not agree that § 1 violates art. 30.

---

[4] Article 30 reads: "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers of either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

We have recognized that art. 30 does not rigidly demand a total separation between the three branches of government but rather that there is a "need for some flexibility in the allocation of functions among the three departments." *Opinion of the Justices*, 375 Mass. 795, 813 (1978). The critical inquiry is whether the actions of one branch interfere with the functions of another. *Id.* In the *Bessie M. Burke Memorial Hosp.* case, *supra* at 746, we discussed art. 30: "The substantial question is whether the legislative enactment itself which dictates a given result involves an improper intrusion on the functions of another branch. This is a problem to be examined on the facts, and seems to us to turn at least in civil matters on whether that enactment infringes on proprietary rights or does other specific injury, so that the issue here is much like that under art. 10." We have already decided, in our discussion under art. 10, that § 1 of the Act does not infringe on the Company's proprietary rights. In the *Burke* case we also said: "The Legislature does not overstep its bounds when by a particular enactment in furtherance of regulation it supersedes an administrative decision without thereby working injury upon a private right . . .; at most this raises a question of form." *Id.* at 747. The Company asserts that the Legislature, by enacting c. 604, dictated the result of an administrative proceeding. We do not agree that the Act can be interpreted as dictating the result of the pending investigation. It merely directs who shall hold the funds in question pending the outcome of the Department's investigation. It does not interfere with the Department's power to make the final decision as to who will be entitled to the funds. It does not reverse a final decision of the Department. The Company's reliance on *Casieri's Case*, 286 Mass. 50 (1934), *Weingartner* v. *North Wales*, 327 Mass. 731 (1951), and *Ziccardi's Case*, 287 Mass. 588, cert. denied, 294 U.S. 716 (1934), is misplaced, because in all those cases the Legislature attempted to reopen final decisions of a court or administrative tribunal. Here, the Department has not made a final decision on this issue and the Legislature's re-

versal of the interim decision does not impermissibly infringe on the Company's property rights. The Legislature has broad regulatory powers in this area and we think that the enactment of c. 604 was within its power and did not violate art. 30.

4. *Retroactivity.* The Department argues that the Act should be given retroactive effect and that the Company should be required to refund that portion of its undercollections from 1980-1981, which it had collected between September 1, 1981, and December 7, 1981, when the Act went into effect. As a general rule, statutes operate prospectively unless a legislative intent that they shall be retrospective is clearly shown. *Nantucket Conservation Found., Inc.* v. *Russell Management,* 380 Mass. 212, 214 (1980), and cases cited. The Act before us fails to manifest a clear intent that it should operate retroactively. Therefore, we apply the general rule of statutory construction and treat the Act as operating prospectively only.

For the reasons already delineated, we decide that § 1 of the Act does not violate the standing laws provision of art. 10, and does not violate art. 30. We leave undecided the constitutionality of the second sentence of § 2 of the Act because of an inadequate record on this issue. The Act is to be given prospective effect only and does not require the Company to refund the undercollections from 1980-1981, which it collected between September 1, 1981, and December 7, 1981.

The case is remanded to the county court for further proceedings consistent with this opinion.

*So ordered.*