FITCHBURG GAS AND ELECTRIC LIGHT COMPANY[1] & others[2] vs.
DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. December 5, 2013. - April 14, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Department of Public Utilities. Public Utilities,* Electric company, Rate set-
ting, Costs of service, Rate of return. *Constitutional Law,* Taking of property.
*Due Process of Law,* Taking of property, Regulatory proceeding.

Statement that where the claims of petitioner electric companies (i.e., that the
prohibition against recovery by them in any rate proceeding before the
Department of Public Utilities [department] of a monetary assessment for
the Storm Trust Fund, as required by G. L. c. 25, § 18, and as imposed on
them by an order of the department, constitutes an unconstitutional taking
in violation of art. 10 of the Massachusetts Declaration of Rights and the
Fifth and Fourteenth Amendments to the United States Constitution) arise
outside the context of a specific rate proceeding, this court must look at
the department's application and accommodation of the statutory prohibi-
tion against recovery for any potential taking. [773-775]
Discussion of the body of case law on per se and regulatory takings of private
property for public use without just or reasonable compensation, which are
prohibited by art. 10 of the Massachusetts Declaration of Rights and the
Fifth and Fourteenth Amendments to the United States Constitution, and
recognition that, with respect to takings claims involving public utilities, a
court must allow the nature of the claim to dictate the selection of the
jurisprudential strand. [775-778]
This court concluded that the prohibition against recovery by petitioner electric
companies in any rate proceeding before the Department of Public Utilities
(department) of a monetary assessment for the Storm Trust Fund, as required
by G. L. c. 25, § 18, and as imposed on them by an order of the depart-
ment, did not constitute an unconstitutional taking in violation of art. 10 of
the Massachusetts Declaration of Rights and the Fifth and Fourteenth
Amendments to the United States Constitution, where the assessment, with
or without the accompanying prohibition against recovery, did not con-
stitute a per se taking, in that there was no showing that the assessment
itself was a taking or that the taking resulted in physical invasion or com-
plete deprivation of all economically beneficial use [778-782]; where, with
respect to the petitioners' claim that the statute denied them a reasonable
rate of return on their investments, because the petitioners did not bring

[1]Doing business as Unitil.
[2]Massachusetts Electric Company, Nantucket Electric Company, NSTAR
Electric Company, and Western Massachusetts Electric Company.

their claim within the context of a specific rate decision, this court could not say that the department had gone too far [782-783]; and where the department's order did not constitute a regulatory taking, in that the economic impact of the order on the petitioners was minimal, it did not interfere with the petitioners' investment-backed expectations, and it implemented the mandate of the statute and served a legitimate public purpose [783-787].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 17, 2012.

The case was reported by *Botsford*, J.

*David S. Rosenzweig (Erika J. Hafner* with him) for the plaintiffs.

*Pierce O. Cray*, Assistant Attorney General (*Rebecca Tepper* with him) for the defendant.

CORDY, J. This matter comes before us on a reservation and report, without decision, by a single justice of this court of an administrative appeal filed pursuant to G. L. c. 25, § 5. The petitioners, electric companies as defined by G. L. c. 164, § 1, within the jurisdiction of the Department of Public Utilities (department), appeal a final order of the department imposing on the petitioners monetary assessments for the Storm Trust Fund (assessment), pursuant to G. L. c. 25, §§ 12P, 18. In accordance with the language of the fourth sentence of G. L. c. 25, § 18, third par., the order specifically prohibited the petitioners from seeking recovery of the assessment in any rate proceeding. The petitioners claim that this prohibition on recovery, as required by the statute and imposed by the department's order, is an unconstitutional taking in violation of art. 10 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution. They seek a declaration that the recovery prohibition is unconstitutional, severance of the prohibition from the remainder of the statutory scheme, and reversal of the department's order.

The petitioners essentially assert three grounds on which the recovery prohibition constitutes a taking. First, they claim that the recovery prohibition, as it operates on the assessment, effects a per se taking without just compensation. We conclude that it does not, because a mere obligation to pay such an assessment,

regardless of whether recovery is permitted or precluded, does not rise to the level of a compensable per se taking. Second, they assert that it constitutes a taking by way of a confiscatory rate because the recovery prohibition denies the petitioners and their shareholders the opportunity to earn a reasonable rate of return on their investment. This claim is inadequate because it does not present a specific rate set by the department that is allegedly confiscatory. Third, the petitioners contend that the department's order imposing the assessment and articulating the recovery prohibition constitutes a regulatory taking under *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978) (*Penn Central*). We conclude that it does not, because the order simply requires the petitioners to pay an assessment that serves a legitimate public purpose and does not in and of itself interfere with the petitioners' over-all property rights. Accordingly, we remand the case to the single justice to affirm the department's order.

*Background.* 1. *Storm assessment.* In 2012, the Legislature created a Storm Trust Fund within the department to enable the department to "investigat[e] the preparation for and responses to storm and other emergency events by the electric companies." St. 2012, c. 216, § 1 (inserting G. L. c. 25, § 12P). Statute 2012, c. 216, also authorized the department to impose "a separate assessment proportionally against each electric company" based on the intrastate operating revenues derived from each company's sales of electric service. G. L. c. 25, § 18, as amended by St. 2012, c. 216, § 2. The statute sets a minimum annual amount for the industry-wide assessment and permits annual increases, up to a defined cap.[3] *Id.* In addition, the statute expressly prohibits electric companies from passing the cost of

---

[3]General Laws c. 25, § 18, third par., provides in relevant part:

"This assessment shall be made at a rate that shall be determined and certified annually by the commission [that supervises the Department of Public Utilities (department)] as sufficient to produce an annual amount of not less than $165,000, plus the costs of fringe benefits and indirect costs as established by the secretary of administration and finance . . . . The amount of the assessment may be increased by the commission annually by a rate not to exceed the most recent annual consumer price index as calculated for the northeast region for all urban consumers."

this assessment on to consumers: "Notwithstanding any general or special law to the contrary, no electric company may seek recovery of any assessments made under this paragraph in any rate proceeding before the department." See *id.* at third par. This is the only assessment within § 18 to prohibit such recovery; the other two enumerated assessments, which serve different purposes, explicitly permit the electric companies to include the assessment as an operating expense, which is then factored into their rate. See *id.* at first and second pars. ("Assessments made under this section may be credited to the normal operating cost of each company"); *Boston Gas Co.* v. *Department of Telecomm. & Energy*, 436 Mass. 233, 234-235 (2002).

The petitioners challenge a September, 2012, order of the department imposing the storm assessment for fiscal year 2013. See Storm Trust Fund Assessment, D.P.U. 12-ASMT-5, at 1 (2012). The total assessment for all electric companies was $191,153, distributed pro rata based on the 2011 operating revenues of each company, and to be credited to the Storm Trust Fund. *Id.* The order explicitly stated, "Pursuant to G. L. c. 25, § 18, no electric company may seek recovery of any amount assessed herein in any rate proceeding before the Department." *Id.* at 2.

2. *Department oversight of utility rates.* Whether recovery of a cost is permitted or prohibited is relevant to the takings analysis because the amount a public utility, such as an electric company, may charge its rate payers, and therefore the return it can make on its investment, is ultimately determined by the department. The department has the authority "to prescribe the 'rates, prices and charges' which utilities may charge." *Boston Edison Co.* v. *Boston*, 390 Mass. 772, 774 (1984), quoting G. L. c. 164, § 94. See *Opinion of the Justices*, 300 Mass. 591, 595 (1938). Public utilities must file rate schedules with the department on a regular basis and when seeking to change a rate; the department may then "investigate the propriety of any proposed rate, price or charge" and "direct[] a change in any schedule filed." G. L. c. 164, § 94.

A rate is ultimately based on two calculations: the rate base, reflecting the utility's reasonable operating expenses, and the rate of return beyond the recoupment of expenses. See *Bay*

*State Gas Co.* v. *Department of Pub. Utils.*, 459 Mass. 807, 808 & n.2 (2011); *Boston Gas Co.*, 436 Mass. at 234. "Together these computations yield a return on investment." *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 n.5 (1977). Public utilities submit calculations for each of these elements, which are subject to modification and approval by the department by way of any number of calculation methods. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 93, 98 (1975). The rate base is meant to include all costs "incurred by efficient management." *Boston Gas Co.* v. *Department of Pub. Utils.*, 387 Mass. 531, 539 (1982). See *Bay State Gas Co.*, 459 Mass. at 814-815. As such, the department typically "exclude[s] from the rate base items that are not currently used and useful to the ratepayers," *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 21, cert. denied, 439 U.S. 921 (1978), as well as costs that are "excessive, unwarranted, or incurred in bad faith." *Boston Gas Co.*, 387 Mass. at 539. It is also within the department's purview to determine an appropriate rate of return, which covers operating expenses and adequately compensates investors based on the risk of investment. *Fitchburg Gas & Elec. Light Co.*, supra at 884. Cf. *Hingham* v. *Department of Telecomm. & Energy*, 433 Mass. 198, 205-206 (2001) (based on shareholder risk, department determined that fourteen per cent return was more appropriate than fifteen per cent return requested by utility).

*Discussion.* The petitioners challenge the constitutionality of the recovery prohibition in G. L. c. 25, § 18, third par., both facially and as applied to them through the department's order, which imposes the assessment and reiterates the recovery prohibition. Where a petition pursuant to G. L. c. 25, § 5, raises constitutional questions, we employ our own independent judgment as to both law and facts. See *Lowell Gas Co.* v. *Department of Pub. Utils.*, 324 Mass. 80, 86, cert. denied, 338 U.S. 825 (1949). Because we presume that statutes are constitutional, the petitioners bear the substantial burden of proving a constitutional violation. See *United States* v. *Sperry Corp.*, 493 U.S. 52, 60 (1989); *Blixt* v. *Blixt*, 437 Mass. 649, 652 (2002), cert. denied, 537 U.S. 1189 (2003).

At the core of the parties' dispute is a question of the ap-

467 Mass. 768 (2014)                                           773

Fitchburg Gas and Electric Light Company *v.* Department of Public Utilities.

propriate legal framework for takings claims made by regulated public utilities in relation to their rates, and not a challenge to a specific rate proceeding. On the whole, the petitioners claim that the recovery prohibition in G. L. c. 25, § 18, third par., is an unconstitutional taking, because it is a direct, per se government taking of their shareholders' property without just compensation, and because it denies them the opportunity to achieve a reasonable rate of return on their investment. In addition, they contend that the department's order imposing the assessment and articulating the recovery prohibition is a regulatory taking. See *Penn Central*, 438 U.S. at 124.

The department argues that the petitioners have not satisfied the requirements under general takings jurisprudence for their per se and regulatory takings claims. In addition, with regard to the petitioners' reasonable rate of return argument, the department asserts that under confiscation jurisprudence, the petitioners have not met their burden of presenting a specific affected rate and demonstrating that excluding the cost of the assessment results in a confiscatory rate. Absent the context of a specific rate proceeding, the department claims that the petitioners have not demonstrated that excluding the cost of the assessment from rate recovery would necessarily result in a confiscatory over-all rate in all circumstances.

We first address a critical assertion underlying the petitioners' claims that the recovery prohibition prevents any possible recovery of the assessment cost, and provide a basic framework of our takings jurisprudence. We then address each of the petitioners' arguments in turn and conclude that on the record presented to us, there is no unconstitutional taking.

1. *Scope of recovery prohibition.* The petitioners' claims rest largely on their assertion that the recovery prohibition eliminates all possible avenues for recouping the cost of the assessment. Because the veracity of this particular assertion heavily influences the remainder of our analysis, we begin by assessing its merits.

The statutory language forbids electric companies from "seek[ing] recovery of [the storm assessment] in any rate proceeding before the department." G. L. c. 25, § 18, third par. Where an agency is tasked with enforcing a statute, the agency has

"substantial discretion" to interpret that statute. *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 457 Mass. 663, 681 (2010). Because the petitioners' claims arise outside the context of a specific rate proceeding, we do not know precisely what interpretation of the statute the department would employ.[4] A possible interpretation of the statute would be, as the petitioners suggest, that the assessment may in no way factor into the rate set by the department. But see *Route One Liquors, Inc.* v. *Secretary of Admin. & Fin.*, 439 Mass. 111, 118 (2003) ("the positing of theoretically possible unreasonable scenarios are insufficient to make [statute] unreasonable" on facial constitutional grounds [citation omitted]). However, under a narrower interpretation, the statute could mean only that the assessment may not be included in the rate base, which is comprised of the reasonably incurred expenses set forth by the electric company. See *Boston Gas Co.*, 387 Mass. at 539.[5] Because the ultimate rate set is determined by the rate base and a reasonable rate of return, this interpretation could, essentially, offset the impact of the assessment through the allowance of a higher rate of return.[6] See Sidak & Spulber, Deregulatory Takings and Breach of the Regulatory Contract, 71 N.Y.U. L. Rev.

[4]It appears that the department itself has not settled on an interpretation of the statutory language. In the order challenged here, the department indicated that "no electric company may seek recovery [of the assessment] in any rate proceeding before the [d]epartment." Storm Trust Fund Assessment, D.P.U. 12-ASMT-5, at 2 (2012). But in a subsequent order imposing the assessment for the next fiscal year, the department indicated that "no electric company may list any amount assessed herein as a recoverable expense in any rate proceeding before the department." Storm Trust Fund Assessment, D.P.U. 13-ASMT-3, at 2 (2013). These statements have qualitatively different import, and we cannot know what meaning the department will give to the recovery prohibition until it actually implements the prohibition in a rate proceeding.

[5]This reading would be the precise converse of the permissive recovery provisions in other assessments authorized by G. L. c. 25, § 18, which indicate that they "may be credited to the [company's] normal operating cost." G. L. c. 25, § 18, first and second pars. A reasonable interpretation of the prohibitive language in paragraph three would be the exact opposite: that a company may *not* include this particular assessment in its expenses for the rate base. See *id.* at third par.

[6]As noted, see note 4, *supra*, in a more recent department order, the department suggested that it may interpret the statute in this way. See Storm Trust Fund Assessment, D.P.U. 13-ASMT-3, at 2 ("Pursuant to G. L. c. 25, § 18, no electric company may list any amount assessed herein as a recover-

851, 958 (1996) ("utility investors must be compensated in one way or another for prudently incurred sunk costs" and listing higher rate of return as one method for such compensation). This distinction is significant because the petitioners have a right to a reasonable rate of return (as discussed below), but they do not have a right to include all identifiable costs in their rate base. See *Boston Gas Co.*, 387 Mass. at 539. Rather, the department may properly limit cost inclusion on certain grounds,[7] as long as the ultimate rate set is not confiscatory. See *id.* See also *Opinion of the Justices*, 423 Mass. 1201, 1218 (1996) ("if the statute allows the setting of guidelines that may reasonably be applied in ways that do not violate constitutional safeguards, then we must indulge that presumption"). It is therefore in the department's application and accommodation of this recovery prohibition where we must look for a potential taking.

2. *Applicable takings jurisprudence.* Article 10 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution prohibit the taking of private property for public use without just or reasonable compensation.[8] There is a well-developed body of case law on per se and regulatory takings, which arises primarily in the con-

---

able expense in any rate proceeding before the [d]epartment"). The use of the more narrow term "recoverable expense" rather than "recovery" could indicate that the department understands § 18 to require only that the assessment cost not be included as a cost in the rate base.

[7] The department may properly exclude costs that are attributable to inefficient management or otherwise unwarranted. See *Bay State Gas Co.* v. *Department of Pub. Utils.*, 459 Mass. 807, 814 (2011); *Boston Gas Co.* v. *Department of Pub. Utils.*, 387 Mass. 531, 539 (1982). In theory, the department could determine that the assessment cost is appropriately excludable not only because of the statutory mandate but also because it stems from concerns regarding the utilities' poor storm preparedness and response. See letter from Attorney General Martha Coakley to Chairs of Joint Comm. on Telecomm., Utils. & Energy, regarding 2011 Sen. Doc. No. 2087, An Act relative to emergency response of public utility companies (Jan. 11, 2012). Exclusion of a cost from the rate base is permissible if the exclusion does not threaten the company's survival and the company is still able to obtain a reasonable rate of return. See *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 312 (1989).

[8] We have consistently employed Federal takings analysis in examining claims under art. 10 of the Massachusetts Declaration of Rights. See *Blair* v. *Department of Conservation & Recreation*, 457 Mass. 634, 643-644 (2010); *Steinbergh* v. *Cambridge*, 413 Mass. 736, 738 (1992), cert. denied, 508 U.S. 909 (1993).

text of land use and economic regulation. A taking requiring compensation can result from a physical invasion or government appropriation of private property. See *Lingle* v. *Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). Government regulatory actions may be deemed per se takings if a regulation causes a permanent physical invasion, see *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426-428 (1982), or if the regulation deprives a property owner of any viable economic use of the property. See *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1015-1016 (1992); *Blair* v. *Department of Conservation & Recreation*, 457 Mass. 634, 639 (2010). A regulatory action also may constitute a taking if it interferes too significantly with one's property use on balance with the legitimate public purpose the interference serves. *Penn Central*, 438 U.S. at 124. See *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 415 (1922).

A separate line of cases has addressed a subset of regulatory takings claims that challenge utility rate decisions as confiscatory. See *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307 (1989); *Boston Gas Co.*, 367 Mass. at 98. This confiscation jurisprudence arises from the "partly public, partly private status of utility property," which "creates its own set of questions under the Takings Clause" and merits a unique legal analysis.[9] See *Duquesne Light Co.*, *supra.* See also *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 557-558 (1908), and cases cited.

We have long recognized that although utilities are subject to State rate regulation, they are entitled to "the opportunity to

---

[9]Consistent with the modern trend in this jurisprudence, we consider a confiscation claim to arise out of the takings clause. Confiscation claims were historically framed primarily as due process violations. See *Bluefield Water Works & Improvement Co.* v. *Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 683, 693 (1923). More recent cases, however, have articulated them as takings claims. See, e.g., *Duquesne Light Co.*, 488 U.S. at 305, 307; *Tenoco Oil Co.* v. *Department of Consumer Affairs*, 876 F.2d 1013, 1023 (1st Cir. 1989); *State Farm Mut. Auto. Ins. Co.* v. *State*, 124 N.J. 32, 50 (1991). See also *Stone* v. *Farmers' Loan & Trust Co.*, 116 U.S. 307, 331 (1886); *Kavanau* v. *Santa Monica Rent Control Bd.*, 16 Cal. 4th 761, 771 (1997), cert. denied, 522 U.S. 1077 (1998), and authorities cited (in context of price or rate regulations, "courts sometimes employ overlapping terminology and standards, treating the [due process and takings] clauses as a single constitutional protection of private property rights").

realize a fair and reasonable return on [their] investment."[10] *Boston Edison Co.*, 375 Mass. at 10. See *Lowell Gas Co.*, 324 Mass. at 94-96. See also *Duquesne Light Co.*, 488 U.S. at 307-308. A confiscatory and therefore unconstitutional rate is one that denies the public utility the opportunity to earn such a return on its investment (its rate base). *Boston Gas Co.*, 367 Mass. at 97-98. See *Duquesne Light Co.*, *supra.* A confiscatory rate can result from the improper exclusion of a cost or item from the rate base, or from a rate of return that is too low to produce a reasonable return that would maintain investor confidence. See *Boston Gas Co.*, 367 Mass. at 97-98. Cf. *Fitchburg Gas & Elec. Light Co.*, 371 Mass. at 884 n.5 ("A utility's income can be increased either by increasing its rate base or by increasing its permissible rate of return").

Takings claims brought by public utilities need not be governed by only one set of takings jurisprudence. A claim of a denial of a reasonable rate of return is a confiscation claim

---

[10]We have defined a fair and reasonable return as one that "covers utility operating expenses, debt service, and dividends, . . . compensates investors for the risks of investment, and . . . is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977), citing *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). The ultimate determination is flexible and within the department's discretion, subject to judicial review. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 11, 15, cert. denied, 439 U.S. 921 (1978).

The concept of a right to a fair and reasonable rate of return developed in tandem with State rate regulation for public utilities. The framework can be traced to the Railroad Commission cases before the United States Supreme Court in 1886. See *Stone*, 116 U.S. at 331 ("[P]ower to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law"). See also Pond, The Law Governing the Fixing of Public Utility Rates: A Response to Recent Judicial and Academic Misconceptions, 41 Admin. L. Rev. 1, 1 (1989); Sidak & Spulber, Deregulatory Takings and Breach of the Regulatory Contract, 71 N.Y.U. L. Rev. 851, 953 (1996). In 1923, in *Bluefield Water Works & Improvement Co.*, 262 U.S. at 693, the Court more specifically indicated that "[t]he return [on a public utility's assets] should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate . . . to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

that is properly governed by the confiscation analysis. Other takings claims, which allege that a regulation either facially or as applied constitutes a taking, merit the application of the broader takings jurisprudence, such as the *Loretto* per se taking standard or the *Penn Central* regulatory taking standard.[11] The nature of the claim properly dictates the selection of the jurisprudential strand.

3. *Per se taking claim.* With this framework, we turn to the petitioners' claims. They first assert that the assessment, as paired with the recovery prohibition, constitutes a per se taking because there is no opportunity for them to recoup the cost through rates. The department avers that by challenging the recovery prohibition, the petitioners are effectively challenging the assessment itself as a taking, despite their claims to the contrary, and that the mere imposition of an obligation to pay money from a company's general funds is not a taking in and of itself. We agree with the department that the assessment, and the accompanying recovery prohibition, is not a per se taking.

A per se taking occurs when a property owner suffers a permanent, physical invasion, without just compensation, of any portion of the property. See *Loretto*, 458 U.S. at 421, 435; *Blair*, 457 Mass. at 639; *Steinbergh* v. *Cambridge*, 413 Mass. 736, 741 (1992), cert. denied, 508 U.S. 909 (1993) (no per se taking

---

[11]There may be circumstances in which it is appropriate to borrow from the confiscation analysis in conducting a *Penn Central* regulatory analysis, which by its nature is flexible and multifactorial. See *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978) (*Penn Central*). See also part 5, *infra.* Several other courts have folded the confiscation analysis into the *Penn Central* framework in various ways. See, e.g., *Texaco P.R., Inc.* v. *Ocasio Rodriguez*, 749 F. Supp. 348, 358 (D. P.R. 1990) (reciting *Penn Central* factors and then employing *Duquesne Light Co.* "just and reasonable" rate of return standard); *Carolina Power & Light Co.* v. *United States*, 48 Fed. Cl. 35, 48 (2000) (employing *Penn Central* test to evaluate assessment imposed on power company, incorporating reasonable rate of return analysis into *Penn Central* analysis because of company's "unique status as a regulated utility," and stating that "utility must show that the impact of the government rate-setting action is so great as to interfere with the utility's ability to make a reasonable rate of return"). We decline, however, to merge these analytical frameworks into one test; the two frameworks apply to different types of claims, albeit all within the takings context, and therefore should each be applied where appropriate. Cf. *Kavanau*, 16 Cal. 4th at 772-773, 775 (employing confiscation analysis on due process claim and *Penn Central* analysis on takings claim).

where "challenged regulation did not authorize, direct, or otherwise involve a physical intrusion into the plaintiffs' property").[12] The United States Supreme Court has distinguished on at least two occasions monetary obligations from physical appropriations of property rising to the level of per se takings. See *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 529-530 (1998) (opinion of O'Connor, J.) (employer's obligation under statute to pay annual premium to commissioner of Social Security for certain retired miners not per se taking because not "permanent physical occupation of [petitioner's] property");[13] *Sperry Corp.*, 493 U.S. at 62 n.8 ("It is artificial to view deductions of a percentage of a monetary award as physical appropriations of property"). On the whole, Federal courts have established that an obligation to pay money is not a per se taking where the obligation does not affect or operate on a specific, identified property interest.[14] See *Koontz* v. *St. Johns River Water Mgt. Dist.*, 133 S. Ct. 2586, 2601 (2013) ("property taxes, user fees, and similar laws and regulations that may impose financial

---

[12]The petitioners do not claim that the assessment and recovery prohibition deprive them of "*all* economically beneficial use" of their property. See *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1019, 1030 (1992). Such a claim would not prevail, as the assessment accounts for only 0.0037% of each company's 2011 operating revenues.

[13]In *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 539, 542-544 (1998) (Kennedy, J., concurring in judgment and dissenting in part), Justice Kennedy emphasized that because the law at issue "neither target[ed] a specific property interest nor depend[ed] upon any particular property for the operation of its statutory mechanisms," it could not be considered a taking. See *Commonwealth Edison Co.* v. *United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001), cert. denied, 535 U.S. 1096 (2002). Justice Breyer, joined by three Justices, also cautioned that an expansion of the takings clause to monetary obligations to the government would call into question the government's ability to assess a tax. *Eastern Enters.*, *supra* at 553-554, 556 (Breyer, J., dissenting).

[14]In contrast, where the assessment must come from a specific fund or account, or is tied to a specific piece of property such that the assessment is, for example, a stand-in for a land use exaction, the assessment may constitute a taking. See *Koontz* v. *St. Johns River Water Mgt. Dist.*, 133 S. Ct. 2586, 2600-2601 (2013); *Eastern Enters.*, 524 U.S. at 540, 543 (Kennedy, J., concurring in judgment and dissenting in part); *Commonwealth Edison Co.*, 271 F.3d at 1340. See also *Brown* v. *Legal Found. of Wash.*, 538 U.S. 216, 224, 235 (2003) (requirement that petitioners place funds in particular interest-earning account and transfer all interest to designated foundation is "more akin to the occupation of a small amount of rooftop space in *Loretto*"; therefore, Court employed per se takings analysis).

burdens on property owners" do not constitute takings); *McCarthy* v. *Cleveland,* 626 F.3d 280, 285-286 (6th Cir. 2010), and cases cited (concurring with seven other United States Circuit Courts of Appeal that "Takings Clause is not an appropriate vehicle to challenge the power of [a legislature] to impose a mere monetary obligation without regard to an identifiable property interest," and concluding that enforcement of traffic offense ordinance against vehicle lessees was not per se taking because it did "not seize or otherwise impair an identifiable fund of money" [citation and quotation marks omitted]); *Branch* v. *United States,* 69 F.3d 1571, 1576 (Fed. Cir. 1995), cert. denied, 519 U.S. 810 (1996) ("[T]he principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability. . . . [T]axes or special municipal assessments indisputably 'take' money from individuals or businesses, [but] assessments of that kind are not . . . *per se* takings").

The assessment here is at bottom a requirement that the petitioners pay the department an annual assessment for a specifically identified purpose with whatever funds the companies choose. G. L. c. 25, § 18, third par. The Legislature is free to authorize such assessments, and the department is free, within certain limits, to collect them.[15]

In concluding that challenged monetary assessments and fees

[15]We cannot accept the petitioner's proposition that *Boston Gas Co.,* 387 Mass. 531, requires us to go against the grain of the national consensus that a monetary obligation is not a per se taking. That case is legally and factually distinct from this one on this point. In *Boston Gas Co., supra,* a special law imposed a $50,000 assessment on a particular natural gas company, *id.* at 532 & n.1, and required that the assessment "be borne by the stockholders of said company." *Id.* at 532 n.1. The company argued that the law violated the standing laws provision of art. 10 by specifically singling out the company for a burden that was not imposed on its peers and by diminishing its property interest. *Id.* at 536-537. We relied on our standing laws jurisprudence to assess whether the special law "diminish[ed] or defeat[ed] an existing property interest." *Id.* at 537, quoting *Commissioner of Pub. Health* v. *Bessie M. Burke Memorial Hosp.,* 366 Mass. 734, 743 (1975). We concluded that this portion of the special law clearly diminished a property right because the $50,000 constituted the company's property and the law led to a permanent deprivation of this property. *Id.* at 539. "The legislation single[d] out the [c]ompany for this burdensome treatment," prior to any determination of erroneous or negligent conduct by the company, and did "not affect other companies which may be equally at fault." *Id.* In the absence of more information in the record

are not per se takings, courts typically have not taken into account whether the payees have the possibility of recovering the cost of the assessment. See, e.g., *Commonwealth Edison Co.* v. *United States*, 271 F.3d 1327, 1338-1339 (Fed. Cir. 2001), cert. denied, 535 U.S. 1096 (2002) (analysis focused solely on whether assessment involved any specific property interest); *Branch*, 69 F.3d at 1577 (court declined to classify assessment as per se taking, even though assessment amount exceeded net worth of bank assessed). Rather, absent a showing that the assessment itself is a taking and that the taking results in physical invasion or complete deprivation of all economically beneficial use, the question of economic impact has been reserved for a regulatory taking analysis, and has not been a determinative consideration in a per se taking analysis.[16] See *Commonwealth Edison Co., supra*; *Branch, supra*. See also *Brown* v. *Legal Found. of Wash.*, 538 U.S. 216, 224, 235 (2003).[17]

---

regarding the company's negligence, we declined to rule on the constitutionality of that portion of the special law. *Id.* at 540. We did, however, conclude that a temporary prohibition on the company's recovery of expenses stemming from the incident that motivated the special law did not violate art. 10. *Id.* at 532 n.1, 537, 538.

[16]We have found only one reference made about the possibility of cost recovery in a per se takings analysis. See *Route One Liquors, Inc.* v. *Secretary of Admin. & Fin.*, 439 Mass. 111, 113, 120 (2003). In that case, we upheld an excise tax on commercial parking lot operators because it did not deny operators "all economically beneficial or productive use" of their property. *Id.* at 120, quoting *Lucas*, 505 U.S. at 1018. In support of this conclusion, we indicated that there was no evidence that "lot operators could not pass on the amount of the excise tax to their customers." *Id.* This observation does not change our analysis here. Where physical invasion or complete deprivation of economic use of the property as a whole has not been established, there is no per se taking. Here, because the petitioners retain some economic use of their property, the recovery prohibition is not dispositive.

[17]Even if the potential for cost recovery were relevant to the determination whether a per se taking has occurred, we would not be persuaded on the record before us that the prohibition on recovery, as it operates on the assessment, necessarily would effect a taking. As discussed above, a reasonable interpretation of the statutory language would be to limit the recovery prohibition to inclusion in the rate base. The mere disallowance of a particular expense from inclusion in the rate base would not constitute a taking, as the petitioners have no automatic right to include all costs. See *Boston Gas Co.*, 387 Mass. at 539. Under this reading, the petitioners could still recover the assessment cost by way of the rate of return, which in relation to the rate base informs the designated rate the utility may collect. Accordingly, the recovery prohibition in G. L. c. 25, § 18, third par., does not necessarily result in a taking in all circumstances.

In sum, we are guided by the decisions in the Federal circuit courts and conclude that, with or without the recovery prohibition, the assessment does not constitute a per se taking. See, e.g., *McCarthy*, 626 F.3d at 285-286; *Commonwealth Edison Co.*, 271 F.3d at 1329, 1340.

4. *Reasonable rate of return claim.* The petitioners next assert that G. L. c. 25, § 18, third par., on its face denies the petitioners a reasonable rate of return on their investments because it constitutes a complete bar to recovery of the assessment cost by prohibiting them from passing on the cost to rate payers. Although they assert that they are making a general takings claim rather than a confiscation claim, they direct us to our confiscation precedent. See, e.g., *Boston Gas Co.*, 387 Mass. at 539; *Fitchburg Gas & Elec. Light Co.*, 371 Mass. at 884. We agree with the department that this claim is appropriately governed by confiscation jurisprudence, as we discuss above, and that it fails to situate the claim within a rate proceeding.

The confiscation analysis clearly requires a challenge to a specific rate decision in order to assess whether the ultimate rate set is confiscatory. Without a record evidencing the permitted recoverable expenses, the determined rate of return, and the ultimate filed rate, we cannot say whether a rate is confiscatory unless we speculate as to what the department might do among its myriad options in the rate-setting process. See *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) (must look to "total effect of the rate order" to determine if it is unreasonable). Because the petitioners do not bring the claim within the context of a specific rate decision, we do not engage in this analysis.

As noted above, there is a reasonable interpretation of the recovery prohibition that would still produce adequate rates for the petitioners. The department could read the statute as requiring only that the assessment cost be excluded from the rate base, and then could provide a higher rate of return to compensate for this exclusion. See *Fitchburg Gas & Elec. Light Co.*, 371 Mass. at 884 n.5. Alternatively, the department could determine that the existing rate of return is adequate to preserve investor confidence and cover legitimate expenses, despite the assess-

ment cost. See *State Farm Mut. Auto. Ins. Co.* v. *State*, 124 N.J. 32, 50 (1991), citing *Edgewater Inv. Assocs.* v. *Borough of Edgewater*, 103 N.J. 227, 240 (1986) (regulated company "must anticipate that its profit levels can be . . . reduced by changes in government regulation. There is no constitutional entitlement to maximum profits"). See *Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968) ("Regulation may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness"). The petitioners are entitled to a *reasonable* rate of return, but not to the rate they desire or have historically received. On the facts as they are presented to us, we cannot say that the department has gone too far.[18] We therefore turn to the petitioners' regulatory taking claim, for which a *Penn Central* analysis is appropriate. Cf. *Carolina Power & Light Co.* v. *United States*, 48 Fed. Cl. 35, 48 (2000) (employing *Penn Central* rather than *Duquesne Light Co.* reasonable rate of return standard to challenge of assessment on public utilities brought outside specific rate-setting context).

*5. Regulatory taking claim.* The petitioners assert that the department's order constitutes a regulatory taking by specifically levying assessments totaling slightly over $190,000, and by denying just compensation, by way of the recovery prohibition. We disagree.

Our regulatory taking analysis consists of "ad hoc, factual inquiries," *Penn Central*, 438 U.S. at 124, employing "several interrelated" and well-established factors. *Daddario* v. *Cape Cod Comm'n*, 425 Mass. 411, 416, cert. denied, 522 U.S. 1036 (1997). To determine whether there has been a compensable regulatory taking, we look to: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regula-

---

[18]The department could, of course, go too far in the future. Where a rate determination, in complying with the recovery prohibition of G. L. c. 25, § 18, third par., defeats the incentive to invest in the public utility and renders the operation of the company financially unfeasible, the department quite likely has gone too far. See *Boston Edison Co.*, 375 Mass. at 16; Sidak & Spulber, *supra* at 945-946 (public utility needs assurance of reasonable return to incur capital costs and serve public interest by providing reasonable, uniform rates).

tion has interfered with distinct investment-backed expectations; and (3) the character of the governmental action" (quotation marks omitted). *Id.*, quoting *Leonard* v. *Brimfield*, 423 Mass. 152, 154, cert. denied, 519 U.S. 1028 (1996). As the department correctly observes, we consider each of these factors in relation to the property as a whole. See *Blair*, 457 Mass. at 642-643; *Steinbergh*, 413 Mass. at 742.

a. *Economic impact.* To constitute a compensable regulatory taking, the economic impact on the property owner must be severe. See *Daddario*, 425 Mass. at 416; *Leonard*, 423 Mass. at 156. "[M]ere diminution in value of property . . . is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc.* v. *Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993). See *Moskow* v. *Commissioner of Envtl. Mgt.*, 384 Mass. 530, 533 (1981), quoting *Lovequist* v. *Conservation Comm'n of Dennis*, 379 Mass. 7, 19 (1979) (regulation "may deprive an owner of a beneficial property use — even the most beneficial such use — without rendering the regulation an unconstitutional taking").

Here, the economic impact is minimal in relation to the petitioners' total budgets. Overall, the assessment represents 0.0037% of each company's 2011 operating revenues. See *Blair*, 457 Mass. at 645 (eight to eleven per cent reduction in amount of usable land could result in diminution of property value but did not interfere to extent of taking, because property owner could "continue to derive significant economic benefit" from whole of property). Although the petitioners are indeed deprived of this money, they retain significant beneficial use of their property without it. See *Daddario*, 425 Mass. at 416-417.

b. *Investment-backed expectations.* We next consider the reasonable and legitimate investment-backed expectations of the petitioners. See *Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986, 1005 (1984); *Gove* v. *Zoning Bd. of Appeals of Chatham*, 444 Mass. 754, 765 (2005). We have previously noted that the mere fact that owners could make a more profitable use of the property and had intended to do so is not sufficient interference with investment-backed expectations. *Flynn* v. *Cambridge*, 383 Mass. 152, 159-160 (1981).

The investment-backed expectations of a public utility and its

investors are quite different from those of the average private landowner. When an investor chooses to invest in a public utility, he or she is presumed to be aware of the high level of regulation. See *Branch*, 69 F.3d at 1575. Historically, public utilities have agreed to subject themselves to State regulation, including required accounting procedures, rate regulation, and other obligations, in exchange for access to public resources and the opportunity to earn a reasonable return on investment. See Priest, The Origins of Utility Regulation and the "Theories of Regulation" Debate, 36 J.L. & Econ. 289, 303 (1993); Sidak & Spulber, *supra* at 898, 907, 909. The utilities' expectations are therefore necessarily limited by the scope of the regulations that bind them.

The public utilities and their investors expect to obtain a reasonable rate of return, such that the enterprise of providing a public utility is at least to some extent profitable. See *Fitchburg Gas & Elec. Light Co.*, 371 Mass. at 884 & n.5. However, as with any business, they have no reasonable expectation to obtain a dollar-for-dollar reimbursement for expenses incurred every year.

Because the challenged department order merely requires the petitioners to pay an assessment, and indicates a limitation on recovery but does not actually implement that limitation, the order itself does not interfere with the petitioners' investment-backed expectations. As we have noted elsewhere, on this record we cannot truly assess "the degree of interference with investment-backed expectations" of the department's order without knowing whether the petitioners will be adequately compensated through the rate-setting process. See *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 403 Mass. 203, 210 (1988). We simply do not know whether they will be denied what is owed to them: an opportunity to achieve a reasonable rate of return.

c. *Character of governmental action.* We turn finally to the character of the government action, and whether the order implementing the mandate of G. L. c. 25, § 18, third par., serves a legitimate public purpose. See *Penn Central*, 438 U.S. at 127; *Blair*, 457 Mass. at 646.

The legislative history of G. L. c. 25, § 18, third par., reflected

in testimony on predecessor bills to the one that ultimately passed, 2012 Sen. Doc. No. 2143, suggests that the legislative purpose was twofold: to enable the department to investigate public utilities' storm preparedness and responsiveness, and to impose penalties on those companies for inadequate storm response planning and implementation. See An Act relative to the emergency service response of public utility companies, Hearing on 2012 Sen. Doc. No. 2140 before S. Comm. on Ways & Means (Feb. 16, 2012) (statement of Sen. Benjamin B. Downing) (goals of legislation are to ensure "significant penalties for utility companies that do not respond in accordance with their emergency response plans" and to provide department with "more resources to complete the thorough investigations we are asking them to do"). See also letter from Attorney General Martha Coakley to Chairs of Joint Comm. on Telecomm., Utils. & Energy, regarding 2011 Sen. Doc. No. 2087, An Act relative to emergency response of public utility companies (Jan. 11, 2012) (indicating that utilities' response to storms was inadequate and advocating for "more robust penalties"). The Attorney General asserted that the companies, rather than the rate payers, should have to absorb the cost of these penalties, because the inadequate storm response caused harm to rate payers. See, e.g., *id.* This legislative purpose of enabling the department to monitor storm responsiveness by public utilities and penalize poor performance in such natural emergencies serves a legitimate public purpose. See *Blair*, 457 Mass. at 646; *Gove*, 444 Mass. at 767. See also *Boston Edison Co.*, 375 Mass. at 44 (operational efficiency and effectiveness of public utilities "are matters of legitimate public interest," and department may place requirements on utilities in furtherance of this interest). Cf. *Carolina Power & Light Co.*, 48 Fed. Cl. at 45. On its face, the recovery prohibition is not at odds with this purpose. Contrary to the petitioners' assertion, we cannot say that requiring the electric companies to absorb the costs associated with achieving these purposes, where the costs are associated with potentially inefficient or inadequate performance by the companies themselves, does not serve to further the legitimate governmental interest at stake.

d. *Balancing.* On the record before us, the petitioners have

not established that the order effects a regulatory taking. See *Yankee Atomic Elec. Co.*, 403 Mass. at 210-211. Absent any related rate proceeding, the order simply requires the electric companies to pay a very small portion of their revenues into a fund that enables the department to investigate the companies' storm preparedness efforts. See G. L. c. 25, § 18, third par.; *Yankee Atomic Elec. Co.*, *supra* at 211 & n.8. It does not alone interfere so significantly with the utilities' over-all property rights as to constitute a compensable regulatory taking. See *Leonard*, 423 Mass. at 156; *Yankee Atomic Elec. Co.*, *supra* at 210-211.

In sum, we conclude that the Legislature may properly authorize the department to impose an assessment of this nature on the public utilities it regulates, and may prohibit the companies from including the assessment as a direct cost in a rate proceeding where the assessment is imposed for a legitimate public purpose. Therefore, G. L. c. 25, § 18, third par., does not, standing alone, effect a taking. However, even when such an assessment is properly excluded from the rate base, the department must permit the utilities to achieve a fair and reasonable rate of return on their investments, in accord with our constitutional mandates. Cf. *Texaco P.R., Inc.* v. *Ocasio Rodriguez*, 749 F. Supp. 348, 373 (D.P.R. 1990). What constitutes a reasonable return is a fact-specific inquiry that must be made in the context of a particular rate proceeding. See *Hope Natural Gas*, 320 U.S. at 602. Because the department order at issue here merely imposes the assessment, and does not reflect any rate decision by the department, the order itself does not constitute a regulatory taking.

*Conclusion.* We remand the case to the single justice, who is directed to affirm the department's order.

*So ordered.*